**No. 2014-5053**

================================================================

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

————————————

KENNETH EARMAN (on behalf of themselves
and all others similarly situated),
                                        Plaintiff -Appellant,


v.


UNITED STATES,
                                        Defendant-Appellee.

————————————

APPEAL FROM THE UNITED STATES COURT OF
FEDERAL CLAIMS IN CASE NO. 1:10-cv-00617-LJB
JUDGE LYNN J. BUSH

————————————

PLAINTIFF-APPELLANT'S CORRECTED INITIAL BRIEF

————————————


ALAN I. SALTMAN
RICHARD W. GOEKEN
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Avenue, N.W.
Suite 600
Washington, D.C. 20036
(202) 452-2140
(202) 775-8217 – fax
email: AISaltman@smithcurrie.com

CHARLES W. SURASKY
SMITH, CURRIE & HANCOCK LLP
245 Peachtree Center Avenue NE
2700 Marquis One Tower
Atlanta, GA  30303-1227
(404) 582-8022
(404) 688-0671 – facsimile
email: cwsurasky@smithcurrie.com

Counsel for Plaintiff-Appellant

Dated:  April 28, 2014

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Kenneth Earman _____ v. United States _____

No. 14-5053 _____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellant _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Kenneth Earman

_____

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

_____

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

_____

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Alan I. Saltman and Richard W. Goeken of Smith, Currie & Hancock LLP

_____

2/26/14
_____        _____
Date                          Signature of counsel

                              Alan I. Saltman
                              _____
                              Printed name of counsel

Please Note: All questions must be answered

cc: _Sharon Snyder_____

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ............................................................................i

STATEMENT OF RELATED CASES ................................................ vii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE................................................................2

STATEMENT OF THE FACTS ............................................................4

SUMMARY OF THE ARGUMENT .....................................................9

ARGUMENT ......................................................................................11

    A. Standard Of Review ................................................................11

    B. An Agency Cannot Legally Contract On Terms That Contradict
       An Applicable Statute And Undermine The Statutory Scheme
       Intended By Congress.............................................................12

    C. The COFC Erred In Concluding That Earman's Argument That
       The Agency's Method For Establishing Base Payments Was
       Contrary To The Plain Meaning Of The CSP Statute Was Not
       Properly Before The Court .....................................................19

CONCLUSION ...................................................................................22

# TABLE OF AUTHORITIES

**CASES**                                                 **PAGE**

*A. H. Bull S.S. Co. v. United States*,
 108 F. Supp. 95 (Ct. Cl. 1952)......................................................................15

*Art Center School v. United States*,
 142 F. Supp. 916 (Ct. Cl. 1956)....................................................................16

*Becton Dickinson and Co. v. C.R. Bard, Inc.*,
 922 F.2d 792 (Fed. Cir. 1990) ......................................................................22

*Beta Sys., Inc. v. United States*,
 838 F.2d 1179 (Fed. Cir. 1988) ....................................................................14

*CACI, Inc. v. Stone*,
 990 F.2d 1233 (Fed. Cir. 1993) ....................................................................14

*Cambridge v. United States*,
 558 F.3d 1331 (Fed. Cir. 2009) ....................................................................11

*Centech Gp., Inc. v. United States*,
 554 F.3d 1029 (Fed. Cir. 2009) ....................................................................19

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
 467 U.S. 837 (1984).........................................................................................8

*Chris Berg, Inc. v. United States*,
 426 F.2d 314 (Ct. Cl. 1970).........................................................................18

*Civil Aeronautics Bd. v. Delta Air Lines, Inc.*,
 367 U.S. 316 (1961).......................................................................................15

ii

*Council for Tribal Employment Rights v. United States*,
    112 Fed. Cl. 231 (2013) ................................................................19

*Earman v. United States*,
    114 Fed. Cl. 81 (2013) ..................................................................3

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)................................................................ 14-15

*Forshey v. Principi*,
    284 F.3d 1335 (Fed. Cir. 2002) ...................................................21

*GHS Heath Maint. Org., Inc. v. United States*,
    536 F.3d 1293 (2008) ............................................................13, 18

*G.L. Christian & Assoc. v. United States*,
    312 F.2d 418 (Ct. Cl. 1963)..................................................13, 18

*Glavey v. United States*,
    182 U.S. 595 (1901)..............................................................16, 17

*Harris Corp. v. Ericsson Inc.*,
    417 F.3d 1241 (Fed. Cir. 2005) ...................................................21

*Hormel v. Helvering*,
    312 U.S. 552 (1941)....................................................................21

*LaBarge Products, Inc. v. West*,
    46 F.3d 1547 (Fed. Cir. 1995) ....................................................18

*Meyers v. United States*,
    96 Fed. Cl. 34 (2010)................................................................5, 7

*Nautilus Shipping Corp. v. United States*,
    158 F. Supp. 353 (Ct. Cl. 1958)..................................................15

*Novosteel SA v. U.S. Bethlehem Steel Corp.*,
   284 F.3d 1261 (Fed. Cir. 2002) ...................................................................20

*Pennzoil-Quaker State Co. v. United States*,
   511 F.3d 1365 (Fed. Cir. 2008) ...................................................................11

*Precision Pine & Timber, Inc. v. United States*,
   596 F.3d 817 (Fed. Cir. 2010) .....................................................................19

*Prestex, Inc. v. United States*,
   320 F.2d 367 (Ct. Cl. 1963) .........................................................................14

*Rockies Express Pipeline v. Salazar*,
   730 F.3d 1330 (Fed. Cir. 2013) ..............................................................13, 18

*S. Cal. Fed. Sav. & Loan Ass'n v. United States*,
   422 F.3d 1319 (Fed. Cir. 2005) ...................................................................11

*Salman Ranch Ltd. v. United States*,
   573 F.3d 1362 (Fed. Cir. 2009) ...................................................................11

*SanDisk Corp. v. Memorex Prods., Inc.*,
   415 F.3d 1278 (Fed. Cir. 2005) ...................................................................12

*Singleton v. Wulff*,
   428 U.S. 106 (1976)......................................................................................21

*Southwestern Oil Florida, Inc. v. United States*,
   119 F. Supp. 731 (Ct. Cl. 1953), *cert. denied*, 348 U.S. 834 (1954).............15

*Sprague S.S. Co. v. United States*,
   172 F. Supp. 674 (Ct. Cl. 1959)....................................................................15

*St. Christopher Assocs., L.P. v. United States*,
   511 F.3d 1376 (Fed. Cir. 2008) ...................................................................19

iv

*United States v. Seatrain Lines*,
  329 U.S. 424 (1947) ................................................................15

## STATUTES AND REGULATIONS

16 U.S.C. § 3838a(d)(1)(A) ......................................................5

16 U.S.C. § 3838a(d)(5) ...........................................................5

16 U.S.C. § 3838a(e)(4)(A) (2002) ...........................................8

16 U.S.C. § 3838c(b) ....................................................5, 6, 7, 21

28 U.S.C. § 1295(a)(3) (2011) ..................................................1

28 U.S.C. § 1491(a)(1) (2011) ..................................................1

7 C.F.R. § 1469.2(a) (2005) .....................................................4

7 C.F.R. § 1469.23 ...................................................................5

7 C.F.R. § 1469.23(a)(2)(iv) .....................................................6

7 C.F.R. § 1469.23(a)(2)(i) ..................................................6, 21

RCFC 12(b)(6) .......................................................................11

RCFC 56 .................................................................................11

69 Fed. Reg. 34,502 (June 21, 2004) ...........................5, 6, 7, 18, 21

70 Fed. Reg. 15,201 (March 25, 2005) ....................................18

## MISCELLANEOUS

28 No. 4 Nash & Cibinic Rep. NL ¶ 19, Apr. 2014...................................14

P.L. No. 107-171, § 2001, codified at 16 U.S.C. §§ 3838a-3388c
     (May 13, 2002) ...........................................................................4

P.L. No. 110-246, § 2701(a), codified at 16 U.S.C. § 3838a(g)(1)
     (June 18, 2008) ...........................................................................9

H.R. Rep. No. 107-424 (2002), as reprinted in 2002 U.S.C.C.A.N. 203 .................7

http://usda.mannlib.cornell.edu/usda/nass/AgriLandVa//2000s/2001/AgriLandVa-
07-12-2001_Cash_Rents.pdf (last visited April 22, 2014).......................7

## **STATEMENT OF RELATED CASES**

No other appeal in or from the same proceeding has previously been before this or any other appellate court.

## JURISDICTIONAL STATEMENT

The United States Court of Federal Claims ("COFC") had jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2011).  The COFC issued an Opinion and Order on December 12, 2013, entering final judgment in favor of Defendant-Appellee and dismissing Plaintiff-Appellant's Fourth Amended Complaint with prejudice.  On February 10, 2014, Kenneth Earman ("Earman") filed a timely notice of appeal from that final judgment.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(3) (2011).

## STATEMENT OF THE ISSUES

1.      Whether an agency can contract on terms that contradict the express provisions of the statute that authorized the contract or undermine Congress' intended statutory scheme.

2.      Whether the COFC erred in concluding that Earman's argument that the agency's method for establishing Base Payments was contrary to the plain meaning of the statute was not properly before the court.

1

## STATEMENT OF THE CASE

Congress established the Conservation Security Program ("CSP") in 2002 to provide farmers and ranchers the opportunity to enter five to ten-year contracts with the Commodity Credit Corporation.  Appendix ("A") 111 at ¶ 1.  Contractors would be paid annual amounts established by formulas set out in the statute for performing agreed-upon conservation work.  The CSP statute also provided for renewal of the contract at the contractor's option.  A116-117 at ¶ 18.

Regulations adopted by the agency, however, contain payment formulas that differ from those in the CSP statute, resulting in much lower payments to contractors.  A119 at ¶ 29.  Additionally, neither the regulations nor the standard CSP contract make any mention of a contractor's option to renew his contract. A117-118 at ¶ 19; A125 at ¶ 124.

Kenneth Earman, on behalf of himself and other similarly situated CSP contractors, filed an amended complaint at the Court of Federal Claims ("COFC"). In Count II of that complaint,[1] Earman alleged that the agency's regulations, incorporated by reference into his contract and pursuant to which contract

---

[1]The amended complaint had five counts.  Earman appeals only with respect to Counts II and IV.

2

payments were calculated, contradicted the CSP statute.  In Count IV, he alleged that, even though the agency had wrongfully failed to include a renewal provision in his contract, such a provision was implied in the contract and the government breached it when Congress eliminated renewals of CSP contracts in 2008.  He also asked the court to certify a class of all CSP contractors.

The COFC granted both the government's motion to dismiss Count II and its motion for summary judgment on Count IV, and denied Earman's cross-motion for summary judgment on all counts.  *Earman v. United States*, 114 Fed. Cl. 81 (2013); Addendum ("Add.") at 1.

The COFC ruled that Counts II and IV were necessarily premised on the CSP statute being incorporated into Earman's contract, and that both counts failed because the CSP statute was not incorporated by reference into the contract. Notwithstanding the government's concession that Earman's contract "must comply with the [CSP] statute," the COFC held that "[b]ecause the CSP statute had not been incorporated by reference into [Earman's] contract," that the statute was irrelevant to the content of the contract.  Add. at 49.

## STATEMENT OF THE FACTS

In § 2001 of the 2002 Farm Bill, Congress created the Conservation Security Program. P.L. No. 107-171, codified at 16 U.S.C. §§ 3838a-3838c (May 13, 2002); Add. at 54-64; A111 at ¶ 1. The Commodity Credit Corporation ("CCC"), a government-owned and operated entity established to assist farmers, was authorized to enter into five to ten-year contracts with farmers and ranchers. A116-117 at ¶ 18. Each CSP contractor would agree to perform approved conservation activities, for which it would receive annual payments computed in accordance with the terms of the statute.[2] A112 at ¶ 5; A114 at ¶ 13; A115 at ¶ 15. The statute further provided that the contract could be renewed at the contractor's option. A116-117 at ¶ 18. Detailed regulations implementing the statute were adopted in 2004. A71 at ¶ 25.

---

[2]The Conservation Security Program and CSP contracts under it are administered on behalf of the CCC by the National Resource Conservation Service ("NRCS"), another division of the Department of Agriculture. 7 C.F.R. § 1469.2(a) (2005); A116 at ¶ 16; A123 at ¶ 53.

4

On September 21, 2005, Earman entered into a ten-year, Tier II CSP contract with the CCC.[3]  A122 at ¶ 49.  Earman contracted to perform a number of conservation practices for which he has received, and continues to receive, annual payments.  A122 at ¶ 49.

Two components of those annual payments are relevant to this litigation, "Base Payments" and "Adjusted Base Payments."[4]  For each CSP contract, under the statute, Adjusted Base Payments were to be calculated using a specified percentage of applicable Base Payments.  *Meyers v. United States*, 96 Fed. Cl. 34, 38 (2010).  *See* 16 U.S.C. § 3838c(b); Add. at 61.

---

[3]By statute, there are three tiers of CSP contracts.  16 U.S.C. § 3838a(d)(1)(A); A114 at ¶ 13; Add. at 56.  The tier of a contract is dependent on the number and scope of conservation practices that the contractor will perform. 16 U.S.C. § 3838a(d)(5); Add. at 57-58.

[4]Although the CSP statute uses the terms "base payment" and "adjusted base payment," the agency's implementing regulations substituted the terms "stewardship payment" and "stewardship payment rate" for "base payment," 69 Fed. Reg. 34,502, 34,514 (June 21, 2004), and "final stewardship rate" for "adjusted base payment."  *See* 7 C.F.R. § 1469.23; Add. at 65.  For the sake of consistency with the language of the CSP statute and the COFC's decision, Earman will refer to stewardship payments/stewardship payment rates as "base payments" and "final stewardship rates" as "adjusted base payments."

5

In Count II of his amended complaint, Earman asserted that the Adjusted

Base Payments made to him pursuant to his contract were, and continue to be, less

than provided for in the CSP statute.  A66-86 at ¶¶ 8-92.

**Adjusted Base Payments (For a Tier II Contract)**

| As mandated in the CSP statute | As included in Earman's contract |
|---|---|
| **Ten** percent (10%) of the corresponding Base Payment.  16 U.S.C. § 3838c(b) | **Five** percent (5%) of the corresponding Base Payment.[5] |

The agency accomplished this reduction from 10% to 5% by calculating the

applicable Base Payment, multiplying it by the statutorily-mandated ten percent for

a Tier II contract, and then further "*[r]educ[ing] stewardship (base) payments by

applying a reduction factor*" of 0.50.  69 Fed. Reg. at 34,503, 34,510 (emphasis

added).

Earman also asserted that the agency had improperly calculated Base

Payments differently and lower than intended by Congress:

---

[5] 7 C.F.R. § 1469.23(a)(2)(iv); Add. at 65; *see also* A71 at ¶ 26.

**Base Payments**

| Per the CSP statute Base Payments are to be: | Per Earman's contract Base Payments were: |
|---|---|
| 2001 average national per-acre rental rate for the particular type of land use covered by the contract.  16 U.S.C. § 3838c(b).[6]<br><br>In the alternative, the statute provides that the agency may instead determine a base payment using "*another appropriate rate* for the 2001 crop year that ensures regional equity." *Id.* (emphasis added).<br><br>Congress, however, limited agency's discretion to set any base payment at a level lower than the applicable 2001 national per-acre rental rate.  H.R. Rep. No. 107-424, at 478 (2002), as reprinted in 2002 U.S.C.C.A.N. 203; *Meyers v. United States,* 96 Fed. Cl. 34, 57 n.14 (2010). | The "average 2001 rates using the Agriculture Foreign Investment Disclosure Act (AFIDA) Land Value Survey, the National Agriculture Statistics Services (NASS) land rental data, and Conservation Reserve Program (CRP) rental rates."  69 Fed. Reg. at 34,529; 7 C.F.R. § 1469.23(a)(2)(i); Add. at 65.<br><br>These amounts were well below each applicable 2001 national per-acre rental rate. |

Because of its conclusion that the CSP statute was irrelevant to Earman's

claims since it had not been incorporated by reference into Earman's contract, the

---

[6]The 2001 average national per-acre rental rates are found at http://usda.mannlib.cornell.edu/usda/nass/AgriLandVa//200s/2001/AgriLandVa-07-12-2001_Cash-Rents.pdf (last visited April 22, 2014).

COFC never decided whether the agency's methods for calculating either Base Payments or Adjusted Base Payments contradicted the CSP statute and the intent of Congress.

At the COFC, the government argued that its implementing regulations (specifically incorporated into Earman's contract) were not "arbitrary or capricious in substance, *or manifestly contrary to the statute*," and thus were entitled to deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). A103 (emphasis added). Once again, the COFC did not decide that question.

In Count IV, Earman asserted that his contract did not comport with the express renewal provision in the CSP statute. A87 at ¶¶ 101-103; A88 at ¶ 104; A105-110; A142-145. The CSP statute as it existed on the date of Earman's contract stated "***at the option of a producer, the conservation security contract of the producer may be renewed for an additional period of not less than 5 nor more than 10 years***," 16 U.S.C. § 3838a(e)(4)(A) (2002) (emphasis added) (Add. at 59), but the agency failed to include any renewal provision in the contract. Earman argued (1) that the government cannot enter into a contract that omits a provision required by the statute authorizing the contract, so that the right of

renewal must be read into his contract, and (2) later legislation that provided "[a] conservation security contract may not be entered into or renewed . . . after September 30, 2008," P.L. No. 110-246, § 2701(a), codified at 16 U.S.C. § 3838a(g)(1) (June 18, 2008), breached his contract.  A106; A108-109.

The COFC ruled that "[Earman's] breach of contract claim in Count IV is based on "*the incorporation of 16 U.S.C. §3838a(e)(4)(A) into [his]contract.*" Add. at 49 (emphasis added).  On that basis it concluded that "*[b]ecause the CSP statute is not incorporated by reference* into plaintiff's contract . . . defendant is entitled to summary judgment."  Add. at 49 (emphasis added).

The COFC also denied Earman's Motion for Class Certification as moot. Add. at 52.

## SUMMARY OF THE ARGUMENT

A.     Earman, the government, and the case law all agree:  Earman's CSP contract must comply with the CSP statute.  The gravamen of Earman's complaint is that his contract does not so comply.

The COFC never reached that issue.  Instead, it concluded that Earman's contract did not have to comply with the CSP statute because the statute was not incorporated by reference into the contract.  That was error.

9

Agents of the government have only the authority conferred on them by statutes or valid regulations implementing statutes. Thus, whether or not an enabling statute is incorporated into a contract, an agency cannot write and carry out a contract that contravenes a statute governing the permissible actions of the agency.

Where – as here, with respect to the contract's pricing provisions – a contract is based on regulations that are invalid because they conflict with the CSP statute, reformation is the appropriate remedy. And where – as here, with respect to the lack of any renewal provision in the contract – a statutorily-required contract provision is omitted, it will be read into the contract as a matter of law.

This Court should reverse the dismissal of Count II and the summary judgment on Count IV, and remand for a determination of the merits of Earman's claims.

B.      Despite having first been made in a reply brief, Earman's argument that the agency's method for calculating Base Payments contravenes the plain language of the CSP statute was timely and properly before the COFC. Earman was replying to an argument newly raised by the government, not raising a new argument on his own.

10

Even if that were not the case, Earman's argument should be considered by the COFC; in the absence of any prejudice to the government, failure to do so is an abuse of discretion.

## ARGUMENT

### A. Standard Of Review

The COFC's grant of a motion to dismiss pursuant to Rules of the Court of Federal Claims ("RCFC") 12(b)(6) for failure to state a claim is reviewed *de novo*. *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009).

Likewise, this Court reviews a grant of summary judgment pursuant to RCFC 56 *de novo*. *Salman Ranch Ltd. v. United States*, 573 F.3d 1362, 1370 (Fed. Cir. 2009), citing *Pennzoil-Quaker State Co. v. United States*, 511 F.3d 1365, 1369 (Fed. Cir. 2008).

Whether an argument replying to an assertion of an opponent was "presented for the first time" in a reply brief is a mixed question of fact and law. For mixed questions of fact and law, the questions of fact are reviewed under the clear error standard and the question of law is reviewed *de novo*. *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1328 (Fed. Cir. 2005).

Whether the trial court properly exercised its discretion in refusing to entertain untimely raised arguments, is reviewed for abuse of discretion. *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005).

### B. An Agency Cannot Legally Contract On Terms That Contradict An Applicable Statute And Undermine The Statutory Scheme Intended By Congress

The central issue in this appeal is whether an agency can contract in contravention of the express provisions of the statute that authorized the contract. At the COFC, the government admitted that it could not, conceding that Earman's contract "must comply with the [CSP] statute." A148 at 22:25. Both the case law and Earman agree with the government on this.

The trial court, *sua sponte* and without any briefing or oral argument of the point, concluded that Earman's contract did not have to comply with the CSP statute because the statute was not expressly incorporated by reference into the contract. Add. at 34-35, 49. In the absence of incorporation, the COFC concluded that Earman lacked any basis to assert that the pricing provisions of his contract were inconsistent with the CSP statute, or that the government had anticipatorily breached his statutorily-mandated right to renew the contract. That was error.

That error effectively rendered the statute irrelevant to Earman's contract. Consequently, the COFC never decided whether the agency's methods for calculating Base Payments and Adjusted Base Payments comported with the statute and the intent of Congress, or whether Earman's contract was inconsistent with the right to renew mandated by the CSP statute in 2006 when the contract was executed.

Whether or not the enabling statute is incorporated into the contract, an agency can neither write nor carry out a contract that contravenes statutes or valid regulations governing the permissible actions of the agency. *See*, *e.g.*, *GHS Health Maint. Org., Inc. v. United States*, 536 F.3d 1293, 1305 (Fed. Cir. 2008) (where a contract provision is based on an invalid regulation, reformation of the contract is appropriate); *Rockies Express Pipeline v. Salazar*, 730 F.3d 1330, 1338 (Fed. Cir. 2013), *citing G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426-27 (Ct. Cl. 1963) (where the government omits a required contract clause courts will read the clause into the contract as a matter of law).

As Prof. Nash recently put it, the pertinent inquiry is "why this situation should be treated as an incorporation-by-reference issue at all. It seems that agencies should be expected to follow their own statutes and [valid] regulations in

13

writing contracts and should be responsible to the contractors, if they don't."  28 No. 4 Nash & Cibinic Rep. NL ¶ 19, Apr. 2014.

As this Court and its predecessor have held time and again, agents of the government have only that authority actually conferred upon them by statute or regulations validly implementing a statute.  *CACI, Inc. v. Stone*, 990 F.2d 1233, 1236 (Fed. Cir. 1993), *citing Prestex, Inc. v. United States*, 320 F.2d 367, 371 (Ct. Cl. 1963).  Thus, the government cannot benefit from any actions taken by its agents in excess of their actual authority.  *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988) (if a contract provision violates the law the government cannot benefit from it despite the "contractor's acquiescence." Contract reformation is the appropriate remedy).

Here, the government cannot benefit by deliberately omitting the renewal provision required by the CSP statute, or by drafting and incorporating regulations which provide lower payments to CSP contractors than Congress mandated in the CSP statute.

Like all other governmental actions, contracts made by the executive branch must be based on a valid delegation of congressional power.  As the Supreme Court stated in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125

14

(2000): "Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" Stated differently, an agency's power is defined "not [by] what the [agency] thinks it should do but what Congress has said it can do." *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 322 (1961), *citing United States v. Seatrain Lines*, 329 U.S. 424, 433 (1947).

That an agency cannot contract contrary to the authority and direction provided by Congress, even where doing so would benefit the United States, is demonstrated in a series of decisions that addressed the sale of government-owned surplus vessels at prices in excess of those prescribed by Congress in the statute authorizing the sales. *See A. H. Bull S.S. Co. v. United States*, 108 F. Supp. 95, 99 (Ct. Cl. 1952); *Southeastern Oil Florida, Inc. v. United States*, 119 F. Supp. 731, 732-734, (Ct. Cl. 1953), *cert. denied*, 348 U.S. 834 (1954); *Nautilus Shipping Corp. v. United States*, 158 F. Supp. 353, 354-355 (Ct. Cl. 1958); *Sprague S.S. Co. v. United States*, 172 F. Supp. 674, 675-676 (Ct. Cl. 1959). In each case, the Court of Claims held that buyers could recover what they had paid in excess of the statutorily-prescribed price, even though they had contracted to pay higher sums.

15

Similarly, in a case involving a statute which authorized the Veterans Administration to pay schools for the education of returning WWII veterans at "the customary cost of tuition," the Court of Claims held: "[T]he law basically obligated the Administrator to make payments for the services rendered according to the measure and guide of the statute and regulations, and when he adopted the mechanism of a contract as a vehicle for the discharge of that duty, it was his duty to make the contract conform to the rule of the statute and regulations." *Art Center School v. United States*, 142 F. Supp. 916, 921 (Ct. Cl. 1956) (the parties could not, by contract, change the terms prescribed by statute).  The court concluded that the plaintiff could recover the difference between its customary rate and the rate it had been paid under the contract. *Id.* at 922.

The Supreme Court took a virtually identical position in *Glavey v. United States*, 182 U.S. 595 (1901).  Congress passed a law directing the Department of Treasury to employ inspectors to inspect the hulls of domestic steam ships.  That law was later amended to direct the Treasury to hire inspectors, at a salary of $2,000 per year, to inspect the hulls of foreign steam ships.  Both the Secretary and the Inspector General of the Treasury told Congress that the position of inspector of foreign steam ships was unnecessary and should be abolished, because its

16

functions could be carried out by inspectors of domestic steam ships, but Congress did not act on this suggestion.

The Secretary appointed Glavey an inspector of domestic steam ships. One month later, Glavey was also appointed as an inspector of foreign steam vessels, albeit without additional compensation. Glavey served in both capacities for more than three years, without complaint. Thereafter, he brought suit for the $6,000 to which he claimed to be entitled by law for having served as inspector of foreign vessels.

Reversing the decision of the Court of Claims, the Supreme Court held that because Congress had specifically provided for the payment of inspectors of foreign vessels:

> It was not competent for the Secretary of the Treasury, having the power of appointment, to defeat that purpose by what was, in effect, a bargain or agreement between him and his appointee that the latter should not demand the compensation fixed by statute.

*Id.* at 609.

Here, Earman asserted at the COFC that: (1) the payment terms in his contract were based on regulations which contravened the CSP statute and thus were neither valid nor binding; and (2) he was entitled to renew his contract, even

17

though it did not contain an express right-to-renew provision, because the renewal

option was mandated by the CSP statute.  A134; A142.

Where a contract provision is based on a regulation and the regulation is

deemed invalid, reformation is appropriate.  *See GHS Health Maint.*, 536 F.3d at

1305; *LaBarge Products, Inc. v. West*, 46 F.3d 1547, 1552 (Fed. Cir. 1995); *Chris*

*Berg, Inc. v. United States*, 426 F.2d 314, 317-18 (Ct. Cl. 1970).  Where a contract

provision required by statute or regulation is omitted, courts will read it into the

contract as a matter of law.  *Rockies Express*, 730 F.3d at 1338; *G.L. Christian*,

312 F.2d at 426-27.[7]

The fact that the CSP statute was not incorporated into Earman's contract

did not deprive him of a right to relief from contract provisions that contravene the

---

[7]During the notice and comment period for the regulations implementing the CSP statute, the agency twice responded to comments suggesting that the regulations should expressly provide for the statutory right of renewal of CSP contracts.  A107-108; A117-118 at ¶ 19.  In both instances, the agency stated that doing so was unnecessary because renewal was fully provided for by the statute. *See* 69 Fed. Reg. at 34,519 ("NRCS received comments concerned that the proposed rule is silent on contract renewal.  Although adding a subsection was considered, *there is no need to repeat direction from the statute*") (emphasis added); *see also* 70 Fed. Reg. 15,201, 15,202 (March 25, 2005) (same).

CSP statute and undermine the intent of Congress reflected in that statute. The COFC erred by holding otherwise.

The COFC's error resulted from its overly-broad reading of *St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376 (Fed. Cir. 2008). Properly construed, *St. Christopher* merely holds that statutes and regulations which *do not* directly govern the permissible actions of the agency in contracting *do not* impose contractual duties unless expressly incorporated into the contract by reference. *Id.* at 1384. *See Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 826 (Fed. Cir. 2010). Where a statute *does* directly govern the permissible actions of the agency in contracting – as the CSP statute does here – an agency cannot contract on terms inconsistent with that statute whether or not the statute is incorporated into the contract. *See Centech Gp., Inc. v. United States*, 554 F.3d 1029, 1039 (Fed. Cir. 2009); *Council for Tribal Employment Rights v. United States*, 112 Fed. Cl. 231, 243-249 (2013).

### C. The COFC Also Erred In Concluding That Earman's Argument That The Agency's Method For Establishing Base Payments Was Contrary To The Plain Meaning Of The CSP Statute Was Not Properly Before The Court

The COFC concluded that one of Earman's arguments – that the agency's method for calculating Base Payments contravened the plain meaning of the statute

19

– was not properly before the court because it had been "presented for the first time in Earman's reply brief." Add. at 30, n.11.

That conclusion was erroneous.

In its response to Earman's cross-motion for summary judgment, the government urged that its method for calculating Base Payments "gave effect to the plain meaning of the CSP statute." A127. In his reply, Earman explained why the government's method did not comply with the plain meaning of the statute. A134-141. Thus, Earman's argument was not "new," but responsive to a new argument made by the government. "[R]eply briefs *reply* to arguments made in the response brief. . . ." *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (emphasis in original).

In his reply brief, not only did Earman reiterate that the agency had set Base Payments at levels below the minimum that was intended by Congress as set out in legislative history, but he also stated the obvious: in setting Base Payments, the agency had not followed either of the mechanisms expressly set out in the CSP statute for doing so. The CSP statute allows the agency to establish Base Payments using either the "average national per-acre rental rate for a specific land use during the 2001 crop year" or "another appropriate rate for the 2001 crop year that ensures

20

regional equity." 16 U.S.C. § 3838c(b); Add at 61.  The CCC did neither.  Despite

the unambiguous directive of the statute, the agency established Base Payments

using an average of ***three rate***s, 69 Fed. Reg. at 34,529; 7 C.F.R.

§ 1469.23(a)(2)(i), each of which was well below the 2001 national per acre rental

rate.  Add. at 65.

Although made in a reply brief, Earman's argument was neither new nor

untimely and was properly before the court.  Even if this were not the case, refusal

to entertain Earman's argument that the agency had failed to comply with the plain

meaning of § 3838c(b) is an abuse of discretion.

Whether to consider untimely-raised issues is left to the court's discretion.

*Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *Hormel v. Helvering*, 312 U.S. 552,

556 (1941).  This discretion is to be exercised on a case-by-case basis, *Singleton*,

428 U.S. at 120; *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1251 (Fed. Cir.

2005), taking all the circumstances into account.  *Forshey v. Principi*, 284 F.3d

1335, 1358 (Fed. Cir. 2002).[8]

---

[8]Even in the case of an unasserted argument, it has been said that the
practice of deeming it waived should not be "governed by a rigid rule but may as a
matter of discretion not be adhered to where circumstances indicate that it would

Here, the government did not claim that it was prejudiced, nor could it have, having raised the same question of law in its response to plaintiff's cross-motion for summary judgment. A127-132. Further, the government did not object to Earman's raising this "new" argument or seek leave to file a sur-reply to address it. This issue was also raised and discussed at oral argument, giving the government an opportunity to respond to Earman's reply. *See* A149 at 40:24-25, 41:1-2. Consequently, there is no rational basis for the COFC not to consider it.

## CONCLUSION

Because the CSP statute directly governed the permissible actions of the CCC in contracting for the conservation services here in issue, the COFC erred by dismissing Count II and awarding summary judgment to the government on Count IV on the grounds that the statute was not incorporated by reference into the contract. Consequently, this Court should:

1. with regard to Count IV (a) reverse the COFC's grant of summary judgment and conclude that, because the agency was required by the CSP statute to include a clause in Earman's contract providing him the right to

---

result in basically unfair procedure." *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990).

renew, the necessary statutory prescription should be implied into the contract or the contract should be reformed to correct any contradiction with the statute; and (b) then remand the question of whether the government breached that contract when Congress precluded the renewal of CSP contracts in 2008;

2. reverse the COFC's dismissal of Count II and remand it with instructions for the COFC to (a) determine whether the terms of Earman's contract relating to payment contradict the CSP statute and/or undermine Congress' intended statutory scheme (including whether the CCC failed to establish Base Payments in the manner prescribed by the plain meaning of 16 U.S.C. § 3838c(b)); and (b) if so, to reform the contract to make it consistent with the specific authority and direction provided to the agency by Congress and direct the payment of such compensation to Earman as is appropriate; and

3. further direct the COFC, consistent with its conclusions on remand, to consider Earman's motion for class certification.

Respectfully submitted,


s/*Alan I. Saltman*

Alan I. Saltman
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Avenue, N.W.
Suite 600
Washington, D.C.  20036
(202) 452-2140
(202) 775-8217 – fax
email: AISaltman@smithcurrie.com

Counsel for Plaintiff-Appellant

OF COUNSEL:

Richard W. Goeken
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Avenue, N.W.
Suite 600
Washington, D.C. 20036
(202) 452-2140

Charles W. Surasky
SMITH, CURRIE & HANCOCK LLP
245 Peachtree Center Avenue NE
2700 Marquis One Tower
Atlanta, GA  30303-1227
(404) 582-8022
(404) 688-0671 – facsimile
email: cwsurasky@smithcurrie.com

Dated:  April 28, 2014

24

# ADDENDUM

# In the United States Court of Federal Claims

No. 10-617 C

(Filed December 12, 2013)

```
* * * * * * * * * * * * * * * * * * * *
```

| | |
|---|---|
| KENNETH EARMAN,                   * <br><br>             *Plaintiff*,     * <br><br>       v.                   * <br><br> THE UNITED STATES,         * <br><br>           *Defendant*.     * | Contract; Reformation and Breach; Conservation Security Program, 16 U.S.C. §§ 3838-3838c (2012); Incorporation of a Statute and Regulations into a Contract. |

```
* * * * * * * * * * * * * * * * * * * *
```

*Alan I. Saltman*, Washington, DC, for plaintiff. *Richard W. Goeken*, Washington, DC, and *Charles W. Surasky*, Atlanta, GA, of counsel.

*Sharon A. Snyder*, United States Department of Justice, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Bryant G. Snee*, Deputy Director, Washington, DC, for defendant. *Joshua Schnell*, Office of General Counsel, United States Department of Agriculture, Washington, DC, of counsel.

―――――――――――――――

## OPINION

―――――――――――――――

**BUSH**, *Senior Judge*.

Now pending before the court are defendant's motion to dismiss pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), and the parties' cross-motions for summary judgment pursuant to RCFC 56. These motions have been fully briefed. Oral argument was held on October 31, 2013. For the reasons described below, the court grants defendant's motion to dismiss

and motion for summary judgment, and denies plaintiff's cross-motion for summary judgment.

## BACKGROUND[1]

The Conservation Security Program (the CSP or the Program) is a federal conservation program administered by the Natural Resources Conservation Service (the Service or the agency) within the United States Department of Agriculture (the USDA). Under the CSP, potential participants develop and submit for approval plans to adopt specified conservation practices on their agricultural property. Upon the government's approval of such a plan, the participant then enters into a written contract with the government to implement the approved conservation practices in exchange for technical and financial assistance.

Kenneth Earman, the plaintiff in this case, is the holder of a CSP contract seeking damages under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2006), for increased payments pursuant to his CSP contract. Mr. Earman alleges that the government has breached his contract – as well as the contracts of a putative class of similarly situated CSP participants – by calculating CSP payments in a manner inconsistent with the CSP statute and the Service's implementing regulations. Mr. Earman also argues that he and others similarly situated are entitled to reformation of their contracts to excise certain provisions on the ground of mutual mistake. Further, plaintiff asserts that he and others similarly situated possess a contractual right of renewal which was breached when Congress enacted legislation in 2008 that prohibited the renewal of CSP contracts after September 30, 2008. Finally, Mr. Earman alleges that the government's alleged repudiation of his and similarly situated CSP participants' contractual right of renewal constitutes an uncompensated taking in violation of the Fifth Amendment to the United States Constitution.

## I.      Factual Background

### A.      The 2002 Farm Bill and the Conservation Security Program

---

[1]/ The facts recounted in this opinion are taken from the Fourth Amended Complaint and the parties' submissions in connection with the motions currently pending before the court. Except where otherwise noted, the facts recounted in this opinion are undisputed.

In May 2002, Congress enacted the Farm Security and Rural Investment Act of 2002 (the 2002 Farm Bill), Pub. L. No. 107-171, 116 Stat. 134, which is now codified as amended at sections 3838 through 3838c in Title 16 of the United States Code (the CSP statute). Fourth Am. Compl. ¶ 7. The 2002 Farm Bill amended several portions of the Food Security Act of 1985 (the 1985 Farm Bill), Pub. L. No. 99-198, 99 Stat. 1354 (codified as amended at 16 U.S.C. §§ 3801-3862 (2012)), and created a voluntary conservation program known as the Conservation Security Program. Fourth Am. Compl. ¶ 8. As originally enacted, the legislation required the Service to establish and implement the CSP in each of fiscal years (FY) 2003 through 2007. 2002 Farm Bill, sec. 2001, § 1238A, 116 Stat. at 225. Congress later extended authorization for the CSP through FY 2011. *See* Deficit Reduction Act of 2005, Pub. L. No. 109-171, tit. I, sec. 1202(a), § 1238A(a), 120 Stat. 4, 5 (2006); Fourth Am. Compl. ¶ 10.

The CSP statute explains that the purpose of the program is "to assist producers of agricultural operations in promoting, as is applicable with respect to land to be enrolled in the program, conservation and improvement of the quality of soil, water, air, energy, plant and animal life, and any other conservation purposes, as determined by the Secretary." 16 U.S.C. § 3838a(a); *see* Pl.'s Resp. to Def.'s Revised Proposed Findings of Uncontroverted Facts (Pl.'s Resp. to DPFUF) ¶ 8. The CSP statute defines "producer" as "an owner, operator, landlord, tenant, or sharecropper" who "shares the risk of producing any crop or livestock" and "is entitled to share in the crop or livestock available for marketing from a farm (or would have shared had the crop or livestock been produced)." 16 U.S.C. § 3838(9)(A). The statute defines "the Secretary" as "the Secretary of Agriculture, acting through the Chief of the Natural Resources Conservation Service." *Id.* § 3838(12).

In order to become eligible for participation in the CSP, an agricultural producer must:

> (A) develop and submit to the Secretary, and obtain the approval of the Secretary of, a conservation security plan that meets the requirements of subsection (c)(1) of this section; and
> (B) enter into a conservation security contract with the

3

Secretary to carry out the conservation security plan.

*Id.* § 3838a(b)(1).

Under the CSP statute, potential participants in the program must first develop a conservation security plan to be approved by the Service. The statute provides that all such plans must identify the land and resources to be protected, must describe the specific conservation practices to be implemented, must set forth a schedule for the implementation and maintenance of those practices during the term of the conservation security contract, and must indicate the tier of the conservation security contract under which the plan will be implemented. *Id.* § 3838a(c)(1).

Once the Service has approved a producer's conservation security plan, it enters into a conservation security contract with that producer to enroll the land covered by the plan in the CSP. *Id.* § 3838a(e)(1). The CSP statute directs the agency to offer eligible producers three tiers of conservation security contracts – Tier I, Tier II, and Tier III – pursuant to which CSP payments may be made to such producers. *Id.* § 3838a(d)(1)(A), (d)(5). Although the CSP statute sets forth general requirements for the three contract tiers, the statute provides that the specific minimum requirements for each contract tier are to be "determined and approved by the Secretary." *Id.* § 3838a(d)(6).

The CSP statute provides for two forms of assistance to eligible producers who adopt specified conservation practices on eligible land. First, the statute provides that "[f]or each of fiscal years 2003 through 2007, the Secretary shall provide technical assistance to producers for the development and implementation of conservation security contracts, in an amount not to exceed 15 percent of amounts expended for the fiscal year." *Id.* § 3838c(g). Technical assistance refers to conservation planning, design, and implementation assistance that the Service provides to producers, including assisting producers to enroll in the CSP. Pl.'s Proposed Findings of Uncontroverted Fact (PPFUF) ¶ 4; *see also* 7 C.F.R. §§ 1466.3 (defining technical assistance as "technical expertise, information, and tools necessary for the conservation of natural resources on land active in agricultural, forestry, or related uses" and stating that the term includes, *inter alia*, (1) "[t]echnical services provided directly to farmers, . . . such as conservation planning, technical consultation, and assistance with design and implementation of

4

conservation practices," and (2) "[t]echnical infrastructure, including activities, processes, tools, and agency functions needed to support delivery of technical services"), 1469.9(b) ("Technical assistance may include, but is not limited to: Assisting applicants during sign-up, processing and assessing applications, assisting the participant in developing the conservation stewardship plan; conservation practice survey, layout, design, installation, and certification; information, education, and training for producers; and quality assurance activities.").

Second, the statute authorizes the government to make an annual payment to each eligible producer who has entered into a conservation security contract with the agency. Annual payments under such contracts comprise as many as three separate components: (1) a specified percentage of a base payment for the type of land covered by the contract (which the court refers to as an adjusted base payment);[2] (2) a cost-sharing payment; and (3) an enhanced payment. 16 U.S.C. § 3838c(b)(1).

Under the CSP statute, the base payment is equal to the 2001 average national per-acre rental rate for the particular type of land use covered by the contract. *Id.* § 3838c(b)(1)(A)(i); Fourth Am. Compl. ¶ 15. In the alternative, the statute provides that the Service may instead adopt as the base payment "another appropriate rate for the 2001 crop year that ensures regional equity." 16 U.S.C. § 3838c(b)(1)(A)(ii); *see also* Fourth Am. Compl. ¶ 15. Once the Service has determined the base payment for the enrolled property, the adjusted base payment is calculated according to the appropriate contract tier for that property. For Tier I, Tier II, and Tier III contracts, the adjusted base payment is equal to five percent, ten percent, and fifteen percent of the base payment, respectively. 16 U.S.C. § 3838c(b)(1)(C)(i), (b)(1)(D)(i), (b)(1)(E)(i); Fourth Am. Compl. ¶ 15.

---

[2]/ Although the CSP statute uses the term "base payment," the Service substituted the term "stewardship payment" for "base payment" in the implementing regulations. Interim Final Rule, 69 Fed. Reg. 34502, 34509, 34514 (June 21, 2004). The regulations define "stewardship payment" as "the CSP base payment component of the payment as described in [7 C.F.R.] § 1469.23(a)." 7 C.F.R. § 1469.3. For the sake of consistency with the language of the CSP statute and the court's prior opinion in *Meyers v. United States*, 96 Fed. Cl. 34 (2010), this opinion refers to stewardship payments as base payments.

5

The CSP statute also provides for cost-sharing payments, which reimburse eligible producers for the cost of adopting new conservation practices and maintaining existing conservation practices on their properties. In general, eligible producers may receive a cost-sharing payment of up to seventy-five percent of the 2001 average county cost of approved practices implemented pursuant to a conservation security contract. 16 U.S.C. § 3838c(b)(1)(C)(ii), (b)(1)(D)(ii), (b)(1)(E)(ii). In addition, "beginning farmers or ranchers" may receive a higher cost-sharing payment of up to ninety percent of the 2001 average county cost of the conservation practices implemented under their contracts. *Id.*

Finally, eligible producers may receive an enhanced payment for the adoption or maintenance of certain conservation practices that exceed the minimum requirements for the applicable tier of conservation security contract. *See id.* § 3838c(b)(1)(C)(iii), (b)(1)(D)(iii), (b)(1)(E)(iii). Enhanced payments may be received for addressing local conservation priorities, participating in a research or pilot project, and in other limited circumstances. *See id.* The CSP statute provides that enhanced payments are to be "determined by the Secretary." *Id.* § 3838c(b)(1)(C)(iii).

The total annual payment to an eligible producer is the sum of the adjusted base payment, cost-sharing payment, and enhanced payment (if any) to which a producer is entitled under its conservation security contract. The CSP statute provides that the total annual payment received by a producer may not exceed $20,000 for a Tier I contract, $35,000 for a Tier II contract, or $45,000 for a Tier III contract. *Id.* § 3838c(b)(2)(A). In addition, the adjusted base payment component of the total annual payment under a conservation security contract may not amount to more than $5000 for a Tier I contract, $10,500 for a Tier II contract, or $13,500 for a Tier III contract. *Id.* § 3838c(b)(2)(B).

## B.    Congressional Limitations on Program Spending

From its inception, the CSP has not been operated with annually appropriated funds. PPFUF ¶ 6. Rather, the 2002 Farm Bill provided that the CSP would be funded through borrowing authority funds drawn from the Commodity Credit Corporation (CCC). Pub. L. No. 107-171, tit. II, sec. 2701, § 1241, 116 Stat. at 278; *see also* PPFUF ¶ 7. The CCC is a federal corporation that was created to stabilize, support, and protect farm prices, and provides financing for

6

various agricultural programs administered by the USDA.  15 U.S.C. § 714 (2012); PPFUF ¶ 8.

The 2002 Farm Bill initially provided an unlimited source of CCC funds for the CSP.  *Meyers v. United States*, 96 Fed. Cl. 34, 39 (2010); Fourth Am. Compl. ¶ 10.  Congress, however, subsequently imposed a number of annual and multi-year spending limitations on the Program.  In February 2003, Congress enacted the Consolidated Appropriations Resolution of 2003, which imposed a multi-year limitation on CSP spending of "not more than $3,773,000,000 for the period of fiscal years 2003 through 2013."  Pub. L. No. 108-7, div. N, tit. II, sec. 216(c), § 1241(a)(3), 117 Stat. 11, 546; Pl.'s Resp. to DPFUF ¶ 12.  Congress subsequently removed this multi-year limitation in January 2004, when it enacted the Consolidated Appropriations Act of 2004, and instead instituted a $41,443,000 annual spending limitation for FY 2004.  Pub. L. No. 108-199, div. A, tit. VII, § 752, 118 Stat. 3, 38 ("Not more than $41,443,000 for fiscal year 2004 of the funds appropriated or otherwise made available by this or any other Act shall be used to carry out the conservation security program . . . .");  Fourth Am. Compl. ¶ 20; Pl.'s Resp. to DPFUF ¶¶ 12-13.  In October 2004, however, Congress enacted the Military Construction Appropriations and Emergency Hurricane Supplemental Appropriations Act of 2005, which instituted a new $6,037,000,000 multi-year limitation on CSP spending for the period from FY 2005 through FY 2014.  Pub. L. No. 108-324, div. B, ch. 1, sec. 101(e), § 1241(a)(3), 118 Stat. 1220, 1235 (2004); Fourth Am. Compl. ¶ 29; Pl.'s Resp. to DPFUF ¶ 12.

In December 2004 and November 2005, Congress enacted appropriations acts for FY 2005 and FY 2006, respectively, which provided that "[n]one of the funds appropriated or otherwise made available by this or any other Act shall be used to pay the salaries and expenses of personnel to carry out a Conservation Security Program" in excess of $202,411,000 for FY 2005 and $259,000,000 for FY 2006.  Consolidated Appropriations Act of 2005, Pub. L. No. 108-447, div. A, tit. VII, § 749, 118 Stat. 2809, 2845 (2004); Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act of 2006 (2006 Appropriations Act), Pub. L. No. 109-97, tit. VII, § 741, 119 Stat. 2120, 2155 (2005); Fourth Am. Compl. ¶¶ 30, 38; Pl.'s Resp. to DPFUF ¶¶ 14, 16.

In February 2006, Congress enacted the Deficit Reduction Act of 2005, by which it extended the Program through 2011, removed the $6,037,000,000 multi-

year limitation on CSP spending for the period of FY 2005 through FY 2014, and imposed new multi-year limitations of $1,954,000,000 for the period of FY 2006 through FY 2010 and $5,650,000,000 for the period of FY 2006 through FY 2015. Pub. L. No. 109-171, tit. I, sec. 1202(b), § 1241(a)(3), 120 Stat. at 5-6; Fourth Am. Compl. ¶¶ 10, 46.

Congress did not pass an appropriation bill for FY 2007. Fourth Am. Compl. ¶ 47; PPFUF ¶¶ 77-79. Instead, it passed a series of continuing appropriations resolutions, the culmination of which was the Revised Continuing Appropriations Resolution of 2007, which amended the 2006 Appropriations Act but continued the $259,000,000 annual limitation on CSP salaries and expenses that had been enacted in the 2006 Appropriations Act. Pub. L. No. 110-5, sec. 2, § 20115, 121 Stat. 8, 16; *see* Fourth Am. Compl. ¶ 47; PPFUF ¶¶ 77-80. In May 2007, however, Congress enacted the U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act of 2007 (the Katrina Act), which eliminated the $259,000,000 annual limitation on CSP salaries and expenses which had been imposed by the 2006 Appropriations Act but left in place the multi-year limitations on CSP spending which had been enacted in the Deficit Reduction Act of 2005. Pub. L. No. 110-28, tit. IX, sec. 9010, § 20115, 121 Stat. 112, 218; Fourth Am. Compl. ¶ 52; Pl.'s Resp. to DPFUF ¶ 20.

## C.    The 2008 Farm Bill

In 2008, Congress passed the Food, Conservation, and Energy Act of 2008 (the 2008 Farm Bill), which replaced the CSP with a new Conservation Stewardship Program to be carried out in FY 2009 through FY 2012 (codified at 16 U.S.C. §§ 3838d-3838g), and further provided that the Service was not authorized to enter into or renew any CSP contracts after September 30, 2008 (codified at 16 U.S.C. § 3838a(g)(1)). *See* Pub. L. No. 110-246, tit. II, subtit. D, § 2301, 122 Stat. 1651, 1768. The 2008 Farm Bill further provided that all CSP contracts executed on or before September 30, 2008 – as well as those CSP contracts executed after that date for which an application was received by the Service during the 2008 sign-up period – would continue to receive payments under the program. *See* 16 U.S.C. § 3838a(g)(2); *Meyers*, 96 Fed. Cl. at 39. The 2008 Farm Bill also removed the multi-year limitations on CSP spending that had been enacted in the Deficit Reduction Act of 2005, and instead directed the Service to carry out the Program "using such sums as are necessary to administer contracts

8

entered into before September 30, 2008." Pub. L. No. 110-246, tit. II, subtit. D, sec. 2701(c), § 1241(a)(3), 122 Stat. at 1800 (codified at 16 U.S.C. § 3841(a)(3)(A)).

### D.     The Service's Implementation of the Program

The 2002 Farm Bill contained an express delegation of rulemaking authority that specifically empowered the Secretary of Agriculture, acting through the Service, to adopt regulations necessary to implement the CSP statute. *See* Pub. L. No. 107-171, tit. II, § 2001(b), 116 Stat. at 233 ("Not later than 270 days after the date of enactment of this Act, the Secretary of Agriculture shall promulgate regulations implementing the amendment made by subsection (a)."); *Meyers*, 96 Fed. Cl. at 53; Pl.'s Resp. to DPFUF ¶ 26. Additionally, the CSP statute itself requires the Service to promulgate regulations to protect the interests of tenants and sharecroppers and to ensure a fair and reasonable application of the payment criteria set forth in the statute. *See* 16 U.S.C. § 3838c(d).

Pursuant to this statutory grant of authority, the agency promulgated regulations for the CSP in June 2004. *See* Interim Final Rule, 69 Fed. Reg. 34502 (June 21, 2004) (codified as amended at 7 C.F.R. §§ 1469.1-1469.36 (2013)). The implementing regulations include a number of provisions that were not contained in the CSP statute. Most pertinent to plaintiff's claims here, the regulations establish a mechanism for prioritizing applications by assigning them to enrollment categories and subcategories, and set forth a method for calculating base payments and adjusted base payments.

First, the regulations provide that the Service will assign enrollment categories and subcategories to each applicant in accordance with various criteria specified in the sign-up notice for the applicable fiscal year. 7 C.F.R. § 1469.6(b). At each program sign-up, the agency "will announce the order in which categories and subcategories are eligible to be funded." *Id.* § 1469.6(b)(4). Enrollment categories are "funded in the order designated in the sign-up notice until the available funding is exhausted." *Id.* § 1469.6(d)(1).

Second, with respect to base payments, the regulations provide that the agency "will initially calculate the average 2001 [national per-acre rental] rates using the Agriculture Foreign Investment Disclosure Act (AFIDA) Land Value

Survey, the National Agriculture Statistics Service (NASS) land rental data, and Conservation Reserve Program (CRP) rental rates." 7 C.F.R. § 1469.23(a)(2)(i). Additionally, "[w]here typical rental rates for a given land use vary widely within a State or between adjacent States, NRCS will adjust the county-level rates to ensure local and regional consistency and equity." *Id.* § 1469.23(a)(2)(ii); *see also* PPFUF ¶ 28. The regulations further provide that adjusted base payments are to be calculated by multiplying the base payment by a tier-specific reduction factor of twenty-five percent for Tier I contracts, fifty percent for Tier II contracts, and seventy-five percent for Tier III contracts, and then by the tier-specific percentage set forth in the CSP statute (five percent for Tier I contracts, ten percent for Tier II contracts, and fifteen percent for Tier III contracts). 7 C.F.R. § 1469.23(a)(2)(iv), (a)(3); Fourth Am. Compl. ¶¶ 25-26, 85; PPFUF ¶ 31; Pl.'s Resp. to DPFUF ¶ 43. Finally, the regulations provide that "[i]n the event that annual funding is insufficient to fund existing contract commitments, the existing contracts will be pro-rated in that contract year." 7 C.F.R. § 1469.23(h).

Between FY 2004 and FY 2008, the Service administered the CSP in accordance with the regulations. In each published sign-up notice to prospective CSP participants, the agency announced that it intended to sort responsive applications (*i.e.*, those which met minimum requirements of the Program) into enrollment categories and subcategories which would be funded in the order specified in the sign-up notice until all available funds were exhausted. 69 Fed. Reg. 34533, 34533 (June 21, 2004); 70 Fed. Reg. 15277, 15278 (Mar. 25, 2005); 71 Fed. Reg. 6250, 6250 (Feb. 7, 2006); 73 Fed. Reg. 16246, 16246 (Mar. 27, 2008). Each sign-up notice further stated that payments would be prorated if a category or subcategory could not be fully funded. 69 Fed. Reg. at 34535; 70 Fed. Reg. at 15280; 71 Fed. Reg. at 6250; 73 Fed. Reg. at 16246, 16249. Additionally, each sign-up notice indicated that adjusted base payments – *i.e.*, stewardship payments – would be calculated by applying the tier-specific percentage set forth in the CSP statute as well as the additional tier-specific reduction factor specified in the implementing regulations. *See* 69 Fed. Reg. at 34534-35; 70 Fed. Reg. at 15279; 71 Fed. Reg. at 6252; 73 Fed. Reg. at 16248-49; Pl.'s Resp. to DPFUF ¶ 56.[3] Consistent with its sign-up notices, from FY 2004 through FY 2008, the

---

[3]/ Each sign-up notice also stated that cost-sharing payments for existing practices would be calculated as a flat rate of twenty-five percent of the adjusted base payment. 69 Fed. Reg. at (continued . . .)

10

Service calculated base payments and adjusted base payments pursuant to the methodology set forth in 7 C.F.R. § 1469.23.  PPFUF ¶¶ 33, 66, 76, 89, 127.

In FY 2005, the Service spent a total of $194,592,715 on the Program, of which between $25,000,000 and $30,000,000 was spent on technical assistance and the remainder was spent on financial assistance.  *See* PPFUF ¶ 64; Pl.'s Resp. to DPFUF ¶ 15.  In FY 2006, the Service spent approximately $250,000,000 on the Program, of which between $34,000,000 and $39,000,000 was spent on technical assistance and the remainder was spent on financial assistance.  In FY 2007, the Service spent between $288,000,000 and $297,000,000 on the Program, of which between $22,500,000 and $26,500,000 was spent on technical assistance and the remainder was spent on financial assistance.  Although the parties dispute the precise amounts expended on technical and financial assistance in FY 2005 through FY 2007, the aforementioned ranges are undisputed and in any event, the variances between Mr. Earman's and defendant's estimation of the technical and financial assistance provided to CSP participants in FY 2005 through FY 2007 are immaterial to the court's resolution of this case.

### E.    Plaintiff's Contract

In response to defendant's sign-up notice for FY 2005, Mr. Earman filed an application to enroll in the CSP and, on September 21, 2005, entered into a ten-year Tier II CSP contract with the CCC pursuant to which he agreed to utilize certain specified conservation practices in the operation of his farm.[4]  Fourth Am. Compl. ¶ 64; PPFUF ¶¶ 44, 49.  On January 16, 2007, Mr. Earman's contract was modified to a Tier III contract because plaintiff had satisfied the additional eligibility requirements for Tier III contracts.  PPFUF ¶ 49.  Plaintiff's contract, as modified, consists of four components:  (1) a Conservation Program Application/Contract; (2) a Contract Appendix; (3) a Conservation Plan Schedule

---

34534-35; 70 Fed. Reg. at 15279; 71 Fed. Reg. at 6252; 73 Fed. Reg. at 16248-49; PPFUF ¶¶ 26, 42, 72, 121; Pl.'s Resp. to DPFUF ¶ 34.

[4]/ Mr. Earman's contract, like all CSP contracts, is administered by the Service on behalf of the CCC.  PPFUF ¶¶ 16, 53; Declaration of Michael Hubbs (Hubbs Decl.) Ex. 1 at A00016 ("NRCS is administering this Contract on behalf of the CCC.  Therefore, where this Contract refers to 'CCC,' NRCS may act on its behalf for the purposes of administering this Contract.").

11

of Operations (the Schedule of Operations); and (4) a revised Conservation Plan Schedule of Operations reflecting plaintiff's contract modification (the revised Schedule of Operations).  Pl.'s Resp. to DPFUF ¶ 67; Hubbs Decl. Exs. 1-3 (Earman Contract).

Mr. Earman's contract, as modified, provides for an expiration date of September 30, 2014.  Pl.'s Resp. to DPFUF ¶ 2; Hubbs Decl. Ex. 3 at A00046. Although the contract provides for termination in certain circumstances, *see* Hubbs Decl. Ex. 1 at A00015 (Contract Appendix ¶¶ 10, 12), plaintiff's contract has not been terminated and remains in effect.

Regarding payments under plaintiff's contract, paragraph 5A of the Contract Appendix provides, in pertinent part:

> Subject to the availability of funds, CCC will make stewardship, existing practice, new practice or enhancement payments at the rates specified in this Contract after a determination by CCC that an eligible practice or activity has been established in compliance with the conservation stewardship plan of operations and in accordance with appropriate standards and specifications.

Hubbs Decl. Ex. 1 at A00012; *see also* Fourth Am. Compl. ¶ 67.  Paragraph 5F of the Contract Appendix further provides:

> Payment under this Contract is subject to the availability of funds.  In the event that annual funding is insufficient to fund existing contract requirements, payment on the existing contracts will be prorated in that contract year, as determined by the Chief.

Hubbs Decl. Ex. 1 at A00013.

The Schedule of Operations set forth eight specific conservation activities that plaintiff was contractually obligated to perform in 2005, as well as the payment amounts corresponding to each item.  PPFUF ¶ 59 (citing Hubbs Decl. Ex. 1 at A00021-23, A00037).  The payment amounts corresponding to these eight

12

conservation activities totaled $5091.  *Id.* ¶¶ 59, 61.  The Schedule of Operations also includes Item No. 88, entitled "[r]eduction due to insufficient annual funding," by which plaintiff's annual payments have been reduced by $2648.  Fourth Am. Compl. ¶ 68; PPFUF ¶ 62; Hubbs Decl. Ex. 2 at A00042.[5]  As a result of this reduction, Mr. Earman received a total payment of $2443 in FY 2005.  *See* Fourth Am. Compl. ¶ 65; PPFUF ¶ 62; Hubbs Decl. Ex. 2 at A00044.  This payment, as well as each subsequent payment made to Mr. Earman under his contract, was calculated in accordance with the methodology set forth in the regulations at 7 C.F.R. §1469.23.  *See* Fourth Am. Compl. ¶¶ 85-89; Pl.'s Mot. at 26 ("Utilizing these rates set forth in the regulations, the agency established base payments (and consequently calculated adjusted base payments) that were far lower than would have been the case had the 2001 national average rental rates been used." (citing PPFUF ¶ 116)), 27 n.34 (noting that 7 C.F.R. § 1469.23 "sets out the further mechanism by which adjusted base payments ('called the stewardship component of a participant's CSP payment') are computed under the regulations" (citing 7 C.F.R. § 1469.23(a)(2)(ii)-(v), (a)(3))); 29 n.36 (noting that the regulations "form the basis for the improper amounts . . . paid to plaintiff (and each member of the yet-to-be certified class)").

## II.    Procedural History

### A.    Initial Proceedings

On September 14, 2010, pseudonymous plaintiff John Doe filed his initial complaint in this case.  In that complaint, Mr. Doe, a CSP contractor, sought to recover damages for the government's alleged failure to make sufficient payments to him under his contract.  On the same day he filed his complaint, Mr. Doe filed a motion to proceed under a pseudonym.

On September 30, 2010, Mr. Doe filed a motion for class certification, in which he requested that the court designate him as the representative of a class of similarly situated plaintiffs and appoint his counsel as the attorney of record for the

---

[5]/  Plaintiff's revised Schedule of Operations, which reflects plaintiff's 2007 contract modification, also includes a similar "[r]eduction due to insufficient annual funding" proviso. Hubbs Decl. Ex. 3 at A00078.

13

proposed class.  Mr. Doe also filed, by right, his First Amended Complaint for the purpose of accommodating potential class members in his proposed class action.

On November 15, 2010, the government filed an unopposed motion to stay the proceedings in this case pending the court's ruling on the government's motion to dismiss the complaint in the related case of *Meyers v. United States*, No. 09-538. Because the legal and factual issues in this case were closely related to those involved in *Meyers*, the court granted the motion to stay this case on November 17, 2010.

On December 23, 2010, the court dismissed the three-count complaint in *Meyers* in its entirety.  In reaching that decision, the court held that "the CSP – understood as encompassing the CSP statute and its implementing regulations – fails to meet any of the three prongs under *Samish II* [*Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005)] and is therefore not a money-mandating source of law in this court."  96 Fed. Cl. at 60.  The court also held that the government's denial of benefits under the CSP did not effect a taking of private property requiring compensation under the Fifth Amendment because the plaintiffs did not possess any compensable property rights in monetary benefits under the CSP.  *Id.* at 62-64.

The plaintiffs in *Meyers* appealed this court's decision to the United States Court of Appeals for the Federal Circuit on February 18, 2011, but they subsequently moved to voluntarily dismiss their appeal.  The Federal Circuit granted that motion and dismissed the appeal on May 9, 2011.

On June 21, 2011, following the dismissal of the appeal in *Meyers*, this court lifted the stay of proceedings in this case.  In response to a request from the parties, the court ordered Mr. Doe to file another amended complaint on or before June 29, 2011.  The court also ordered defendant to respond to Mr. Doe's motion to proceed under a pseudonym.  Finally, the court directed the Clerk's Office to continue the stay of proceedings for the pending motion for class certification.[6]

---

[6]/  Pursuant to the court's order of June 21, 2011, the motion for class certification remains suspended.

14

Mr. Doe filed his Second Amended Complaint on June 29, 2011, and the government moved to dismiss that complaint pursuant to RCFC 12(b)(1) and RCFC 12(b)(6) on August 29, 2011.

### B.  Proceedings Involving Mr. Earman

Mr. Doe did not respond to the government's motion to dismiss; instead, with the consent of the government, he filed a five-count Third Amended Complaint on September 30, 2011.  The Third Amended Complaint included a new named plaintiff, Kenneth Earman, in addition to Mr. Doe.  The complaint also set forth the RCFC 23 class action requirements that had been omitted from the earlier versions of the complaint.  The court denied the government's pending motion to dismiss as moot on October 3, 2011.  On December 2, 2011, defendant filed a motion for summary judgment or, in the alternative, to dismiss the Third Amended Complaint.

On July 30, 2012, the court granted the government's motion to dismiss under RCFC 12(b)(1) with respect to Count I of the Third Amended Complaint, but denied the government's motion with respect to all remaining counts.  In reaching that decision, the court held that Mr. Doe and Mr. Earman had failed to exhaust their administrative remedies as required by law.  In a separate order issued the same day, the court denied Mr. Doe's motion to proceed under a pseudonym and also ordered Mr. Doe to either reveal his true identity or withdraw from the case.  On August 8, 2012, Mr. Doe voluntarily withdrew from this suit, leaving Mr. Earman as the sole plaintiff in this case.[7]

With permission of the court, Mr. Earman filed a Fourth Amended Complaint on November 19, 2012.  The Fourth Amended Complaint contains five counts.  In the first count, Mr. Earman seeks reformation of his contract to excise the "[r]eduction due to insufficient annual funding" proviso in Item 88 of the Schedule of Operations.  Plaintiff contends that Item 88 is contrary to law and based on the mistaken belief that sufficient funding was not available to make "full" adjusted base payments to CSP participants, *i.e.*, adjusted base payments calculated without using an additional reduction factor.  Mr. Earman also seeks

---

[7]/  The court will henceforth refer to Mr. Earman as "plaintiff" or by name.

15

**Add.15**

reformation on behalf of a putative class of similarly situated CSP participants to excise similar provisos in their CSP contracts.

In the second count, plaintiff alleges that the government breached his and similarly situated CSP participants' contracts in FY 2005 and each year thereafter by paying lower base payments than the CSP statute required. In the third count, presented as an alternative to Count II, plaintiff alleges that the government has breached his and similarly situated CSP participants' contracts since at least May 2007 by continuing to pay lower base payments even after Congress had removed annual limitations on CSP spending. Mr. Earman further alleges that these alleged underpayments have resulted in a reduced existing practice cost-sharing payment. In Counts II and III, Mr. Earman seeks damages for amounts he and similarly situated CSP participants have allegedly been underpaid.

In the fourth count, Mr. Earman asserts that he and others similarly situated possess a contractual right of renewal and that the government breached this right by enacting the 2008 Farm Bill, which prohibited the renewal of any CSP contracts after September 30, 2008. In the fifth count, plaintiff alleges, in the alternative to Count IV, that the abrogation of his and similarly situated CSP participants' alleged right of renewal effected an uncompensated taking in violation of the Fifth Amendment to the United States Constitution.

## C.    The Pending Motions

On February 1, 2013, the government filed a motion to dismiss Counts II and III of the Fourth Amended Complaint under RCFC 12(b)(6), as well as a motion for summary judgment on Counts I, IV, and V under RCFC 56. On March 20, 2013, plaintiff filed a response to the government's motions as well as a cross-motion for summary judgment on all counts. The government filed its reply and response on June 28, 2013, and plaintiff filed his reply on August 1, 2013.

Defendant moves to dismiss Counts II and III for failure to state a claim on the ground that plaintiff fails to allege any provision of his contract entitling him to the additional payments he seeks. Defendant further contends that to the extent plaintiff is challenging the agency's payment methodology without reference to specific contractual terms and conditions, the court lacks jurisdiction over Counts II and III because, as the court held in *Meyers*, the CSP is not a money-mandating

16

source of law sufficient to confer jurisdiction under the Tucker Act. Additionally, defendant argues that the Service's methodology for calculating payments to CSP participants, as set forth in the agency's regulations, is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984).

In response to the government's arguments for dismissal of Count II, plaintiff contends that deference is inappropriate because the Service's methodology for calculating base payments and adjusted base payments is contrary to the CSP statute and its legislative history. With respect to Count III, plaintiff argues that the Service violated its own implementing regulations by continuing to calculate adjusted base payments using an additional reduction factor after Congress had removed annual limitations on CSP spending. Plaintiff contends that these alleged violations constitute a breach of his contract because the CSP statute and regulations are incorporated into his contract. Furthermore, as an additional argument in support of Count II, plaintiff argues that he is entitled to reformation of his contract because it is contrary to the CSP statute.

In reply, defendant argues that the Service's methodology is consistent with, and gives effect to, the plain meaning of the CSP statute and regulations. Additionally, defendant contends that, even if the CSP statute and regulations were ambiguous, the agency's methodology reflects a reasonable and permissible construction of the statute and regulations.

Defendant also moves for summary judgment on Counts I, IV, and V. Regarding Count I, defendant argues that plaintiff cannot establish that he is entitled to contract reformation based on an assertion of mutual mistake. With respect to Counts IV and V, defendant asserts that plaintiff's contract does not provide a right of renewal and, thus, plaintiff is unable to demonstrate a specific contractual provision that has been breached and has no cognizable property interest that could be the subject of a valid takings claim under the Fifth Amendment. In response, plaintiff argues that his contract provides a right of renewal because it incorporates the CSP statute, including 16 U.S.C. § 3838a(e)(4)(A), which plaintiff asserts required all CSP contracts to be renewable at the option of the contractor.

17

Finally, with respect to Count V, defendant contends that plaintiff's alleged right of renewal is not the proper subject of a takings claim because it arises exclusively under plaintiff's contract. In response, plaintiff argues that his takings claim is an alternative to his breach of contract claim in Count IV, and asks the court to stay the filing of plaintiff's reply as to Count V, as well as the court's disposition of count V, pending the court's resolution of Count IV.[8]

## DISCUSSION

## I.      Standards of Review

### A.      RCFC 12(b)(6)

It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When considering a motion to dismiss under this rule, "the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief," dismissal is warranted under RCFC 12(b)(6). *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007). To survive a motion to dismiss for failure to state a claim, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. While a complaint is not required to contain detailed factual allegations, it must provide "enough facts to state a claim for relief that is plausible on its face." *Id.* at 570. In order to meet the requirement of facial plausibility, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.      RCFC 56

---

[8]/ No such request for a stay was included in plaintiff's opening brief. Indeed, in that brief, plaintiff requested summary judgment on Count V. Pl.'s Mot. at 3, 65-67.

18

**Add.18**

The availability of summary judgment helps a federal court "'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material if it would affect the outcome of the suit. *Anderson*, 477 U.S. at 248. A dispute of material fact is genuine if a reasonable trier of fact could return a verdict for the nonmoving party. *See id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted) (stating that there is no genuine issue "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

The moving party bears the burden of showing the absence of any genuine issue of material fact. *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex*, 477 U.S. at 325). All doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). However, the nonmoving party has the burden of producing sufficient evidence to show a genuine dispute of material fact which would allow a reasonable finder of fact to rule in its favor. *Anderson*, 477 U.S. at 256. Such evidence need not be admissible at trial; nevertheless, mere denials, conclusory statements or evidence that is merely colorable or not significantly probative are not sufficient to preclude summary judgment. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 249-50, 256; *Mingus*, 812 F.2d at 1390-91; *see also Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835-36 (Fed. Cir. 1984) ("With respect to whether there is a genuine issue, the court may not simply accept a party's statement that a fact is challenged.") (citation omitted). "The party opposing the motion must point to an evidentiary conflict created on the record by at least a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant." *Barmag*, 731 F.2d at 836. Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and on which that party bears the burden of proof at trial. *Dairyland*, 16 F.3d at 1202 (citing *Celotex*, 477 U.S. at 323).

19

Cross-motions for summary judgment "are not an admission that no material facts remain at issue." *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997) (citing *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978)). The parties may focus on different legal principles and allege as undisputed a different set of facts. *Id.* "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." *Id.*

## II.    Analysis

### A.    Contract Reformation Claim (Count I)

In Count I, Mr. Earman seeks reformation of his contract to excise the "[r]eduction due to insufficient annual funding" proviso in Item 88 of the Schedule of Operations by which plaintiff's annual payment under his contract was reduced by $2648 in FY 2005 and each fiscal year thereafter. *See* Fourth Am. Compl. ¶¶ 34-36, 64-82; PPFUF ¶¶ 62-63. Plaintiff argues that Item 88 must be excised from his contract because it was based on the Service's "mistaken belief that in fiscal years ('FY') 2005 and 2006 insufficient funds were available to pay all CSP contractors in full for work required to be performed under their contracts." Pl.'s Mot. at 4; *see also* Fourth Am. Compl. ¶¶ 64-82.

Mr. Earman's argument in that regard rests on two factual premises. First, plaintiff contends that the inclusion of Item 88 in his contract was based on the Service's belief that insufficient funds were available to the Service to make financial assistance payments "in full" to CSP participants, *i.e.*, payments calculated without using an additional reduction factor. In support of this premise, plaintiff refers to the Service's discussion of its interim final regulations, in which the agency stated that it would (1) make payments to CSP participants according to enrollment categories and subcategories until CSP funding is exhausted and (2) reduce adjusted base payments by applying an additional reduction factor in those years in which the CSP is "only partially funded":

> The CSP statutory provisions were written without a
> specific mechanism for limiting payments if the program
> were only partially funded. With a cap of $41.443
> million for FY 2004, this interim final rule adopts

20

provisions of the proposed rule setting forth a mechanism
for limiting payments for those years when the CSP is
only partially funded.  In this regard, the interim final
rule includes provisions to:

- Limit the sign-up periods.
- Limit participation to priority watersheds.
- Limit participation to certain enrollment categories.
- Reduce stewardship (base) payments by applying a reduction factor.
- Limit the number and type of existing and new practice payments.

. . . .

Once the highest enrollment category's applications are
funded within all priority watersheds, the next category
would be funded, etc.  If all the applications in a category
cannot be funded, then NRCS will fund subcategories in
the same manner.  Subcategories will be announced in
each sign-up.  Funding will be distributed to each
succeeding category to fund subcategories until funding
is exhausted.

69 Fed. Reg. at 34503, 34506; *see* Pl.'s Mot. at 8; PPFUF ¶¶ 30, 37.  Plaintiff also
refers to the Service's 2005 and 2006 sign-up notices, which stated that enrollment
categories would be funded in order until available funding was exhausted, and
that "[i]f funds are not available to fund an entire category, then the applications
will fall into subcategories and funded in order until funds are exhausted."  70 Fed.
Reg. at 15278; 71 Fed. Reg. at 6250; *see* Def.'s Mot. at 9-10; PPFUF ¶¶ 43, 71.

These authorities, plaintiff contends, "demonstrate[] . . . [that] to the extent
that funds were available, the agency's intention was to enter into CSP contracts
pursuant to which it would pay the contractor at the full rates specified therein for
the work required of him under the contract."  Pl.'s Mot. at 9 (citing PPFUF ¶ 38).
Based on this alleged intention of the Service to make "full" payment so long as

21

**Add.21**

sufficient funds were "available" to the agency, plaintiff argues that Item 88 "states that his payments for 2005 were being reduced because funds were not available to make full payment." Pl.'s Reply at 2.

As to plaintiff's second factual premise in support of his reformation claim, plaintiff asserts that because the Service did not spend the full amount of its annual or multi-year spending limits for the CSP in FY 2005 or FY 2006, and because the Service spent more on technical assistance in those years than the total amount of alleged financial assistance underpayment to plaintiff and similarly situated CSP participants, sufficient funds were in fact "available" to make "full" payments to the contractors:

> [T]here never was any such insufficient funding for CSP contracts in FY 2005 (or in FY 2006). Accordingly, even if potential CSP participants knew that funding could be pro-rated if sufficient funds were not available, that knowledge was of no moment where, as here, albeit not realized by either party, sufficient funds were, in fact, always available to make full payments to all contractors.

Pl.'s Mot. at 10. In this regard, plaintiff first notes that the Service spent only $194,592,715 on the Program in FY 2005 – "$7,818,285 less than the [$202,411,000] which Congress allowed it to spend." *Id.* at 15. According to plaintiff, "[b]ecause there is no evidence that these funds were expended elsewhere, all $7,818,285 was available (and in fact more than sufficient) to have fully paid plaintiff and those similarly situated the $6,207,298 that they were denied in FY 2005 because of an alleged insufficiency of funds to do so." *Id.* (citing PPFUF ¶ 64).[9] Plaintiff also asserts that, of the $194,592,715 spent on the CSP in FY 2005, more than $25,000,000 was spent on technical assistance – which

---

[9]/ Plaintiff makes a similar argument with respect to FY 2006, noting that the Service spent only approximately $250,000,000 on the Program in FY 2006 – which plaintiff contends is "$8.7 million less than what Congress allowed NRCS to spend." Pl.'s Mot. at 15 n.24 (citing PPFUF ¶ 67). Plaintiff also asserts that "[t]his $8.7 million represents 70% of the amount ($12,506,369) that CSP contractors were denied due to an alleged insufficiency of funds in FY 2006." *Id.*

22

plaintiff contends is "an amount considerably in excess of the $6,207,298 by which Earman and others similarly situated were underpaid in FY 2005." *Id.* at 12.[10]

From these two factual premises, plaintiff draws the conclusion that "plaintiff's contract (like that of each person similarly situated) was expressly based on the erroneous belief that such funds were not available. . . . [and] [t]his mistake as to the amount of funds actually available constituted <u>the</u> basic assumption underlying the inclusion in the contract of a Reduction Due to Insufficient Funding provision and the 50% reduction in the amount that Mr. Earman was paid for his services in 2005." Pl.'s Mot. at 13-14 (footnotes omitted). Accordingly, plaintiff argues, "under the rules governing reformation of government contracts, Mr. Earman and all others similarly situated are entitled to reformation excising the 'reduction due to insufficient funding' provision from their contracts and payment for the amounts denied them as a result of the inclusion of that provision." *Id.* at 14 (citations omitted).

As defendant correctly notes, reformation of a written agreement on the ground of mutual mistake is an "extraordinary remedy" and is available only upon satisfactory proof of four elements: (1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking reformation. *Nat'l Australia Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006); *see* Def.'s Reply at 1-2. "The general rule is that the elements of a claim for reformation must be proved by clear and convincing evidence." *Nat'l Australia Bank*, 452 F.3d at 1329 (citing *Philippine Sugar Estates Dev. Co. v. Gov't of Philippine Islands*, 247 U.S. 385, 391 (1918) (stating that reformation will not be granted "unless the proof of mutual mistake be of the clearest and most satisfactory character") (citations and internal quotation marks omitted), 27 *Williston on Contracts* § 70.54 (4th ed.), and *Restatement (Second) of Contracts* § 155 cmt. c, at 410 (1981)).

---

[10]/ Again, plaintiff makes a similar argument with respect to FY 2006, noting that of the approximately $250,000,000 spent on the CSP in FY 2006, at least $34,000,000 was spent on technical assistance – which plaintiff contends is "an amount considerably in excess of the amount ($12,506,369) that CSP contractors were underpaid due to an alleged insufficiency of funds in FY 2006." Pl.'s Mot. at 12 n.19.

23

The purpose of reformation of a written agreement on the ground of mutual mistake is "'to make [the written agreement] reflect the true agreement of the parties on which there was a meeting of the minds.'" *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990) (quoting *Am. President Lines v. United States*, 821 F.2d 1571, 1582 (Fed. Cir. 1987)); *see also Philippine Sugar Estates*, 247 U.S. at 389 (noting that "[i]t is well settled that courts of equity will reform a written contract where, owing to mutual mistake, the language used therein did not fully or accurately express the agreement and intention of the parties"); *Nat'l Australia Bank*, 452 F.3d at 1329 ("[R]eformation is available 'when the parties, having reached an agreement and having attempted to reduce it to writing, fail to express it correctly in the writing.'" (quoting *Indiana Ins. Co. v. Pana Cmty. Unit Sch. Dist. No. 8*, 314 F.3d 895, 903-04 (7th Cir. 2003), and *Restatement (Second) of Contracts*, *supra*, § 155 cmt. a, at 406)).

Defendant argues that plaintiff cannot establish the first element of his reformation claim because he "cannot demonstrate that the parties were mistaken in their belief that limited CSP funding was available at the time of contracting." Def.'s Reply at 3. Defendant asserts that it is undisputed that Congress had imposed annual limitations on CSP spending in 2005 and 2006, and, therefore, the parties could not have been mistaken in their belief that only limited funding was available for the CSP at the time that plaintiff's contract was executed. *Id.* Additionally, defendant argues that the Service's failure to exhaust the annual CSP spending limitations in FY 2005 and FY 2006 demonstrates, at most, its imprecise prediction regarding the "future costs of providing technical and financial assistance for the CSP," not a mistake relating to facts in existence at the time plaintiff's contract was entered. *Id.* at 5-6.

In response, plaintiff asserts that his reformation claim is not based on a mutual mistake regarding whether there was limited funding for the CSP. Rather, plaintiff contends that the mistake allegedly made by the parties was their supposedly erroneous belief that insufficient CSP funds were "legally available" for the agency to make "full" payments to CSP participants, *i.e.*, without applying an additional reduction factor, even taking into account annual spending limitations:

24

> Contrary to defendant's contention, the mistake here is
> not whether there was **limited funding** for [the] CSP in
> 2005 and 2006, but whether sufficient funds were legally
> available to pay plaintiff and 4,875 other CSP contractors
> for work required by contract. That is, there is no dispute
> that in 2005 and 2006, Congress had imposed limits on
> the ability of the Commodity Credit Corporation
> ("CCC") to spend money that it possessed on the CSP
> program. However, taking those spending limits into
> account, here the parties mistakenly believed that
> sufficient money was not available at the time of
> contracting for the CCC to pay Earman in full for the
> work to be performed under the contract in 2005.

Pl.'s Reply at 2 (citations omitted).

As noted, *supra*, summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and on which that party bears the burden of proof at trial. *Dairyland*, 16 F.3d at 1202 (citing *Celotex*, 477 U.S. at 323). Having considered all of the parties' arguments regarding Count I, the court agrees with defendant that plaintiff has not produced sufficient evidence to show that a mutual mistake of fact occurred in this instance.

The first and most fundamental flaw with plaintiff's arguments with respect to Count I is the failure to cite *any* evidence of Mr. Earman's belief as to the unavailability of CSP funds to fully compensate him for his conservation activities. Here, neither of plaintiff's briefs cites any record evidence as to *Mr. Earman's* beliefs, mistaken or otherwise, as to the availability or unavailability of CSP funds to fully compensate him for his conservation activities. Aside from a bare, unsupported allegation that a mutual mistake occurred so as to warrant reformation of Mr. Earman's contract, plaintiff's theory of mutual mistake relies entirely on supposition regarding the *Service's* alleged mistake of fact regarding the unavailability of CSP funds. This is not enough to support a claim of *mutual* mistake, or to survive defendant's motion for summary judgment as to Count I.

Second, the mistake plaintiff alleges does not relate to a fact in existence at the time plaintiff's contract was executed. To satisfy the first element of a claim for reformation, a plaintiff must demonstrate that the parties held an "erroneous belief as to an *existing fact*." *Atlas Corp.*, 895 F.2d at 750 (emphasis added). "If the existence of a fact is not known to the contracting parties, they cannot have a belief concerning that fact; therefore, there can be no 'mistake.'" *Id.* The "availability" of CSP funds in FY 2005 and FY 2006, as plaintiff uses that term, is necessarily dependent upon the amount of technical assistance and financial assistance ultimately spent by the Service in FY 2005 and FY 2006. Plaintiff entered his contract on September 21, 2005, before the end of FY 2005. PPFUF ¶¶ 44, 49. At that time, the Service's total CSP spending for FY 2005 (let alone for FY 2006) was not an "existing fact" but rather a future event which the parties could only predict. "'A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a mistake as that word is defined [under the doctrine of mutual mistake of fact].'" *Dairyland*, 16 F.3d at 1203 (quoting *Restatement (Second) of Contracts*, *supra*, § 151 cmt. a, at 383); *see also Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 53-54 (2000) (citing *Dairyland*, 16 F.3d at 1203). Plaintiff cannot sustain a claim for reformation on the ground of mutual mistake with regard to the "availability" of CSP funds in FY 2005 and FY 2006 when such "availability" could not be determined until after the time of contracting.

Third, plaintiff's additional argument for reformation, based on the United States Supreme Court's decision in *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631 (2005), is similarly without merit. Plaintiff relies on *Cherokee* for the proposition that the amount the Service chose to spend on technical assistance in FY 2005 and FY 2006 has no effect on the "legal availability" of sufficient funds to make "full" financial assistance payments in those years because the Service could have reduced spending on technical assistance and, correspondingly, increased spending on financial assistance. In *Cherokee*, two Indian tribes sued the government for breach of contract for failure to make contractually required payment of "contract support costs" incurred by the tribes in supplying health services normally provided by the Department of Health and Human Services' Indian Health Service. 543 U.S. at 635-37. The government did not deny that it promised, but failed, to pay these costs; rather, it argued it was excused from having to make these payments because Congress had not appropriated sufficient funds for the payments. *Id.* at 636. The Supreme Court ruled in favor of the

26

Indian tribes, finding that the government could not avoid its contractual obligations on the ground of insufficient appropriations. *Id.* at 636-47.

Plaintiff erroneously argues that the facts in *Cherokee* are "quite analogous" to the instant case, *see* Def.'s Reply at 16, and that "[t]he holding in *Cherokee* has direct applicability" to plaintiff's reformation claim, *see id.* at 18. As defendant correctly notes, *Cherokee* did not involve a contract reformation claim. *See* 543 U.S. at 631; Def.'s Reply at 6 n.7. Indeed, plaintiff has not cited, and the court has not found, any decision of any court citing *Cherokee* in support of a contract reformation claim. Moreover, the contract at issue in *Cherokee* clearly required the government to make the payments demanded; indeed, the government in that case conceded it had promised to make such payments but argued that it was excused from its contractual obligation because of insufficient appropriations. *See* 543 U.S. at 636. Here, by contrast, plaintiff was paid the full amount he was entitled to receive under the terms of his written contract. *See* Fourth Am. Compl. ¶ 65; PPFUF ¶ 62; Hubbs Decl. Ex. 2 at A00044 (Schedule of Operations stating that plaintiff's total payment in FY 2005 would be $2443, *i.e.*, $5091 minus the $2648 reduction set forth in Item 88). Thus, plaintiff's reliance on *Cherokee* is misplaced.

Finally, in his reply brief, Mr. Earman argues for the first time that reformation of his contract is necessary to prevent the government from being unjustly enriched by withholding payment for the "full value" of plaintiff's conservation activities in FY 2005 and FY 2006. Pl.'s Reply at 6 (citing *United Elec. Corp. v. United States*, 647 F.2d 1082, 1087 (Ct. Cl. 1981) (*United Electric*), and *Land Grantors in Henderson, Union, & Webster Cntys. v. United States*, 81 Fed. Cl. 580, 609-11 (2008) (*Land Grantors*)). Because plaintiff raises this argument in his reply brief and defendant did not have an opportunity to respond, the argument is not properly before the court and the court need not consider it. *See, e.g.*, *Extreme Coatings, Inc. v. United States*, 109 Fed. Cl. 450, 452 n.1 (2013) (stating that an argument raised for the first time in a reply brief is not properly before the court) (citations omitted). Moreover, even if plaintiff's argument were properly before the court, it is not persuasive because neither case cited by plaintiff involved a contract reformation claim. *United Electric* involved a subcontractor's breach of contract claim against the government for compensation due under a subcontract where both the prime contractor and surety had failed or refused to make payment and where the government retained funds owing on the contract.

27

The Court of Claims held that the subcontractor lacked standing to sue but noted, in *dictum*, that its holding "is not a happy result if [the subcontractor] ends up without payment to which it is entitled and for which contract money is available from the Government." *United Electric*, 647 F.2d at 1087. Nothing in *United Electric* mandates reformation of a contract on the ground of unjust enrichment. *Land Grantors* involved a restitution claim based on alleged misrepresentations by one party to a contract and, accordingly, is completely inapposite to plaintiff's reformation claim based on mutual mistake. 81 Fed. Cl. at 609 (noting that "misrepresentations made by Government agents in negotiating the 1942-44 contracts were a factor in Claimants' decision to sell [land containing coal, gas, oil, and mineral deposits], without further inquiry," and that "mistake on one side and misrepresentation, whether willful or accidental, on the other, constitute a ground for reformation where the party misled has relied [on] the misrepresentation of the party seeking to bind him") (citations omitted).

In summary, plaintiff has not identified sufficient evidence to raise a genuine issue of material fact as to the existence of a mutual mistake. Therefore, defendant is entitled to summary judgment on plaintiff's contract reformation claim in Count I.

## B.    Breach of Contract Claim Based On Alleged Underpayment of Base Payments (Counts II and III)

As noted previously, Mr. Earman alleges in Counts II and III that the government has breached his contract – as well as the contracts of a putative class of similarly situated CSP participants – by paying lower base payments than were required by his contract. Defendant moves to dismiss Counts II and III for failure to state a claim because plaintiff "fails to point to any provision of his contract that requires the specific payments he seeks" and even fails to attach a copy of his contract to the Fourth Amended Complaint. Def.'s Mot. at 9-11.

In order to recover for a breach of contract, plaintiff must allege: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). As stated previously by this court, "'there is a minimum burden for [a] [p]laintiff, in asserting a breach of contract claim, to explicitly identify the provisions and

28

terms of the contract that have been breached.'" *Gonzalez-McCaulley Inv. Grp., Inc. v. United States*, 93 Fed. Cl. 710, 715 (2010) (quoting *Garreaux v. United States*, 77 Fed. Cl. 726, 730 (2007)). This requirement is embodied in RCFC 9(k), which imposes a special pleading requirement for claims against the United States based on a contract:

> In pleading a claim founded on a contract or treaty, a party must identify the substantive provisions of the contract or treaty on which the party relies. In lieu of a description, the party may annex to the complaint a copy of the contract or treaty, indicating the relevant provisions.

The rationale for this burden is that "[i]n order for the court to render a decision on a breach of contract claim, it must know the relevant terms of the contract." *Gonzalez-McCaulley*, 93 Fed. Cl. at 715.

Mr. Earman does not allege that the government has breached any provision within the four corners of his or similarly situated CSP participants' written contracts. Indeed, there is no dispute that Mr. Earman and similarly situated CSP participants have received payments in accordance with the express terms of their contracts. Rather, Mr. Earman alleges that the government has calculated base payments and adjusted base payments in a manner inconsistent with the CSP statute and the Service's implementing regulations. Mr. Earman contends that these alleged statutory and regulatory violations constitute a breach of his and similarly situated CSP participants' contracts because the CSP statute and regulations are incorporated into all CSP contracts, either expressly or by operation of law. Therefore, to resolve the parties' motions with respect to Counts II and III, the court must determine whether the disputed provisions of the CSP statute and regulations are indeed incorporated into plaintiff's contract.

### 1.   Is the CSP Statute Incorporated into Mr. Earman's Contract? (Count II)

In Count II, Mr. Earman alleges that the Service's methodology for calculating base payments and adjusted base payments results in a breach of plaintiff's and similarly situated CSP participants' contracts because the methodology is contrary to the CSP statute. *See* Fourth Am. Compl. ¶¶ 83-92. In

**Add.29**

this regard, plaintiff first contends that the base payment component of his total annual payment, which is calculated using the methodology set forth in the Service's implementing regulations, 7 C.F.R. § 1469.23(a)(2), is lower than the 2001 average national per-acre rental rate set forth in the CSP statute, *see* 16 U.S.C. § 3838c(b)(1)(A)(i), and, thus, is contrary to congressional intent as expressed in the CSP statute and its legislative history, *see* Pl.'s Mot. at 25-29; Pl.'s Reply at 7-13.[11]  Next, plaintiff argues that the agency's use of an additional tier-specific reduction factor to calculate adjusted base payments is contrary to the plain language of the CSP statute, specifically 16 U.S.C. § 3838c(b)(1), which plaintiff contends contains "mandatory language . . . [which] prevented the agency from directly (or indirectly) adopting percentage reduction factors greater (or less) than the ones stated in the statute."  Pl.'s Mot. at 30; *see also* Pl.'s Reply at 13-14.

Plaintiff argues that the government's alleged violations of the CSP statute constitute a breach of his contract for two reasons.  First, relying primarily upon the Federal Circuit's decision in *Roedler v. United States Department of Energy*, 255 F.3d 1347 (Fed. Cir. 2001), and this court's decision in *Dalles Irrigation District v. United States*, 82 Fed. Cl. 346 (2008), plaintiff asserts that where, as here, a government contract implements a statute, the contract must be "construed in a manner consistent with the intent of the statute which the contract implements," Pl.'s Mot. at 23-24, and is breached to the extent it contradicts congressional intent as set forth in the underlying statute, *see id.* at 28-29.  Second, Mr. Earman argues that the CSP statute is incorporated into his contract via the Service's implementing regulations, specifically 7 C.F.R. § 1469.21(e)(3).  *See id.* at 23 & n.30.  This regulation provides that a CSP contract must "[i]ncorporate all provisions as required by law or statute," including provisions requiring CSP participants to

---

[11]/  In his opening brief, Mr. Earman's argument with respect to base payments (as opposed to adjusted base payments) is based solely on the legislative history of the CSP statute. *See* Pl.'s Mot. at 25-29.  In his reply brief, plaintiff contends for the first time that the Service's methodology for calculating base payments is also contrary to the plain language of the CSP statute.  *See* Pl.'s Reply at 7-11.  Plaintiff's base payments argument premised upon the plain language of the CSP statute is not properly before the court because it was presented for the first time in plaintiff's reply brief.  *See, e.g.*, *Extreme Coatings*, 109 Fed. Cl. at 452 n.1.

> (i) Implement and maintain the practices as identified and scheduled in the conservation stewardship plan, including those needed to be eligible for the specified tier of participation and comply with any additional sign-up requirements,
>
> (ii) Not conduct any practices on the farm or ranch that tend to defeat the purposes of the contract,
>
> (iii) Comply with the terms of the contract, or documents incorporated by reference into the contract. NRCS will give the participant a reasonable time, as determined by the State Conservationist, to correct any violation and comply with the terms of the contract and attachments thereto. If a violation continues, the State Conservationist may terminate the conservation stewardship contract, and
>
> (iv) Supply records and information as required by CCC to determine compliance with the contract and requirements of CSP[.]

7 C.F.R. § 1469.21(e)(3). Neither argument is persuasive.

At the outset, the court observes that plaintiff's reliance upon *Roedler* and *Dalles* is unavailing. The plaintiffs in *Roedler*, a putative class of rate-paying customers for electric power produced from nuclear fuel by Northern States Power Company (Northern), sued the government for amounts paid by Northern into the Nuclear Waste Fund in accordance with the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270 (2006) (the NWPA), and contracts entered between Northern and the Department of Energy (the DOE) pursuant to the NWPA. Dismissing the complaint, the district court held, *inter alia*, that the plaintiffs were not third-party beneficiaries of the contracts between the DOE and Northern. On appeal, the Federal Circuit considered the issue of whether the contracts between the DOE and Northern evinced a mutual intention to afford third-party beneficiary status to Northern's customers. In addressing that issue, the Federal Circuit stated that "[f]or determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose." *Roedler*, 255 F.3d at 1352 (citing *Rendleman v. Bowen*, 860 F.2d 1537, 1541-42 (9th Cir. 1988), *Am. Hosp. Ass'n v. Schweiker*,

31

**Add.31**

721 F.2d 170, 183 (7th Cir. 1983), and *Busby School of N. Cheyenne Tribe v. United States*, 8 Cl. Ct. 596, 602 (1985)).  The court then considered the NWPA and its legislative history to determine whether the plaintiffs' status as customers and users of nuclear-generated power afforded them third-party beneficiary rights under Northern's contracts with the DOE, and answered that question in the negative.  *See id.* at 1352-53.  This court, in *Dalles*, cited *Roedler* for the broad proposition that "[w]here a contract implements or fulfills a statutory requirement, the interpretation of the contract will be guided by the underlying statute," and interpreted a contract for the provision of hydroelectric power by the Department of the Interior to the plaintiff for irrigation pumping by considering the statute which authorized the contract.  *See* 82 Fed. Cl. at 355.

Relying upon *Roedler* and *Dalles*, Mr. Earman asserts that his contract "must be interpreted and applied in light of the underlying [CSP] statute," Pl.'s Mot. at 31, and that "because defendant's calculation of base payments (due to its use of rates lower than average national rental rates for 2001) and adjusted base payments . . . were contrary to the manner specified by statute, each constituted a separate breach of plaintiff's CSP contract (and the contract of each and every other CSP participant)," *id.* at 32; *see also id.* at 29 ("[*Dalles*] teaches that, where Congress intended that adjusted base payments under a resulting contract were to be computed using specified factors, the agency wrongfully computed those payments when it used other factors.").

Plaintiff's reliance upon *Roedler* and *Dalles* for the proposition that his contract must be read to include the underlying CSP statute is undermined by the Federal Circuit's decision in *St. Christopher Associates, L.P. v. United States*, 511 F.3d 1376 (Fed. Cir. 2008), which subsequently distinguished *Roedler* on its facts and rejected the same argument made by Mr. Earman here.  In *St. Christopher*, a former owner of an apartment project sued the government for breach of contract based on the Department of Housing and Urban Development's refusal to consider the owner's rent increase request.  In support of its contention that the contract required the agency to consider the rent increase request, the plaintiff asserted that the agreement "inherently includes an obligation to consider a rent increase request based on underlying statutes, regulations, and agency guidance."  *St. Christopher*, 511 F.3d at 1381.  In that regard, the *St. Christopher* plaintiff, citing *Roedler*, argued that the contract "should be construed in light of the statutory program that it implements and the purpose of that program."  *Id.* at 1383.  In addressing that

32

argument, the Federal Circuit first noted that "[t]his court has been reluctant to find that statutory or regulatory provisions are incorporated into a contract with the government unless the contract explicitly provides for their incorporation." *Id.* at 1384 (citing *Smithson v. United States*, 847 F.2d 791, 794 (Fed. Cir. 1988)). The court then rejected the plaintiff's argument for incorporation by implication, and stated that "there is simply no Federal Circuit precedent holding that it is proper to read into a contract statutes, regulations, or agency guidance when they are not incorporated by reference into the contract." *Id.* (footnote omitted). In reaching this conclusion, the court rejected the plaintiff's reliance on *Roedler*, and concluded that "*Roedler* holds only that when it is unclear from the contract whether a third party is a beneficiary, the court may look to the governing statute to attempt to adduce whether the party is an intended third party beneficiary." *Id.* at 1384 n.4.

The Federal Circuit in *St. Christopher* thus expressly limited *Roedler* to the unique context of determining third-party beneficiary status under a government contract. As such, neither *Roedler* nor this court's reliance on *Roedler* in *Dalles* supports plaintiff's arguments with respect to Count II. Additionally, to the extent that *Dalles*, including its characterization of the Federal Circuit's decision in *Roedler*, may be read to support plaintiff's breach of contract claims, *Dalles* is not binding on this court. *See AINS, Inc. v. United States*, 365 F.3d 1333, 1336 n.1 (Fed. Cir. 2004) (stating that holdings of the Court of Federal Claims, "like those of federal district courts, are instructive but not precedential, and do not bind future court holdings"), *abrogated on other grounds by Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011).

The only other binding authority cited by Mr. Earman in support of his contention that his contract must be read to include the underlying CSP statute is the Federal Circuit's decision in *Nebraska Public Power District v. United States*, 590 F.3d 1357 (Fed. Cir. 2010). *See* Pl.'s Mot. at 28-29, 31-32. That case is readily distinguishable. *Nebraska Public Power* addressed the issue of whether a mandamus order issued by the United States Court of Appeals for the District of Columbia was impliedly forbidden by the Tucker Act as invading upon the exclusive jurisdiction of this court for the adjudication of certain contract rights. *See* 590 F.3d at 1375-76. The Federal Circuit decided that question in the negative, concluding that the D.C. Circuit's mandamus order "was issued pursuant to the D.C. Circuit's authority to construe the NWPA and to direct DOE to comply

33

with its obligations under the statute" and "did not address any issue of contract breach, direct the implementation of any remedy, or construe any contract defense, except to the extent that the proposed interpretation of the contract would conflict with the statutory directive in section 302(a)(5) [to accept and dispose of nuclear waste by January 31, 1998]." *Id.* Here, by contrast, plaintiff's breach of contract claims call upon this court to decide only his contractual rights. As *Nebraska Public Power* says nothing about incorporation of a statute into a contract, it provides no support for plaintiff's claims.

Accordingly, under binding precedent, this court may not read provisions of the CSP statute into plaintiff's contract unless those provisions are expressly incorporated into his contract. *See St. Christopher*, 511 F.3d at 1384 & n.4; *Texas v. United States*, 537 F.2d 466, 471 (Ct. Cl. 1976) ("In suing for a breach of contract plaintiff must rely on the express terms of the contract and cannot, as it has attempted to do here, import into the agreement terms outside of those expressly contained in the agreement.") (citation omitted); *see also Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 826 (Fed. Cir. 2010) ("In the absence of explicit contract language incorporating the [Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544 (2012)], we decline to create a whole new set of obligations – compliance with the multitude of substantive and procedural requirements comprising the ESA – by mere implication." (citing *St. Christopher*, 511 F.3d at 1384)).

In its reply brief, the government surprisingly concedes, without discussion, that it "does not dispute that the CSP statute is incorporated into Mr. Earman's contract." Def.'s Reply at 29. The government expanded upon this concession at oral argument by asserting that the CSP statute is incorporated into Mr. Earman's contract by paragraph 13B of the Contract Appendix, which provides that the contract "shall be carried out in accordance with all applicable Federal statutes and regulations." Tr. at 22. The government also expressed its "understanding that because [Mr. Earman's] contract is a conservation security program contract[, . . .] it must comply with the [CSP] statute." *Id.*

Incorporation by reference, however, is a question of law. *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1343 (Fed. Cir. 2008) (*Northrop Grumman*) (citing *Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007), and *Advanced Display Sys. v. Kent State Univ.*, 212

34

F.3d 1272, 1283 (Fed. Cir. 2000)). Stipulations on questions of law are not binding on the court. *Sanford's Estate v. Comm'r*, 308 U.S. 39, 51 (1939) ("We are not bound to accept, as controlling, stipulations as to questions of law.") (citations omitted); *Technicon Instruments Corp. v. Alpkem Corp.*, 866 F.2d 417, 421-22 (Fed. Cir. 1989) ("'If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law.'" (quoting *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289 (1917))). Therefore, it is for the court to decide whether the CSP statute is incorporated into plaintiff's contract.

The court concludes that the CSP statute is not incorporated into plaintiff's contract. For extrinsic material to be incorporated into a contract by reference, the contract "must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history)." *Northrop Grumman*, 535 F.3d at 1345; *cf. St. Christopher*, 511 F.3d at 1384 ("This court has been reluctant to find that statutory or regulatory provisions are incorporated into a contract with the government unless the contract explicitly provides for their incorporation." (citing *Smithson*, 847 F.2d at 794)). Nothing in plaintiff's contract explicitly provides for the incorporation of the CSP statute. Rather, plaintiff's contract merely provides that it "'shall be carried out in accordance with all applicable Federal statutes and regulations.'" PPFUF ¶ 52 (quoting Hubbs Decl. Ex. 1 at A00016 (Contract Appendix ¶ 13B)). This language, which does not refer to any particular statutory or regulatory provision, cannot reasonably be read as incorporating the entire corpus of the CSP statute into plaintiff's contract. *See Smithson*, 847 F.2d at 794 (rejecting plaintiff's argument that an entire body of regulations promulgated by the Farmers Home Administration was incorporated by reference into plaintiff's contract, based on a provision stating that the contract was "subject to" such regulations, because "[t]his is hardly the type of clause that should be read as incorporating fully into the contract all the FmHA regulations" and "if that were the parties' purpose, they would have explicitly so provided"); *cf. S. Cal. Edison Co. v. United States*, 226 F.3d 1349, 1353 (Fed. Cir. 2000) (*Southern California Edison*) (concluding that contracts incorporated the terms and conditions of certain regulations by specifically referring to the regulations as being made part of the

35

contracts "as fully and completely as though set forth herein [*i.e.*, in the contracts] in length").

With respect to plaintiff's second argument in support of incorporation of the CSP statute into his contract – *i.e.*, that the CSP statute is incorporated into his contract via the Service's implementing regulations, *see* Pl.'s Mot. at 23 & n.30 (quoting 7 C.F.R. § 1469.21(e)(3)) – plaintiff cites no authority supporting the proposition that a statutory provision may be incorporated into a government contract via an agency regulation. Furthermore, even if the court were to assume that an agency regulation could incorporate a statutory provision into a government contract, nothing in 7 C.F.R. § 1469.21(e)(3) explicitly provides for the incorporation of 16 U.S.C. § 3838c(b)(1) – the provision of the CSP statute setting forth the criteria for determining base payments and adjusted base payments to CSP participants – into plaintiff's contract.

Because plaintiff's breach of contract claim in Count II is based solely on § 3838c(b)(1) of the CSP statute, which the court concludes is not incorporated into plaintiff's contract, plaintiff has failed to identify a contractual provision which plausibly entitles him to the additional payments he seeks in Count II.[12]

## 2. Is the Service's Discussion of its Interim Final Regulations Incorporated into Mr. Earman's Contract? (Count III)

In Count III, plaintiff alleges, as an alternative to Count II, that the Service violated its implementing regulations by making reduced payments to Mr. Earman after Congress removed annual limitations on CSP spending by enacting the Katrina Act in May 2007. The specific language upon which plaintiff relies is a portion of the Service's discussion of its interim final regulations in which the

---

[12]/ In the alternative to his claim for damages, plaintiff also argues that he is entitled to reformation of his contract because it is based on regulations which are contrary to the CSP statute. Pl.'s Mot. at 32 (citing *GHS Health Maint. Org., Inc. v. United States*, 536 F.3d 1293 (Fed. Cir. 2008), and *LaBarge Prods., Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1995)). Plaintiff's argument is unpersuasive. Here, in contrast to *GHS Health* and *LaBarge*, there is no money-mandating source of law which would allow the court to reach the predicate issue of whether the Service's methodology for calculating base payments and adjusted base payments, as expressed in the implementing regulations and in plaintiff's contract, violates the CSP statute. *See infra* Part II.B.3. Therefore, *GHS Health* and *LaBarge* have no application to this case.

Service stated that the regulations established a "mechanism for limiting payments for those years when the CSP is only partially funded." Fourth Am. Compl. ¶¶ 93-100; Pl.'s Mot. at 33-34 (citing 69 Fed. Reg. at 34503). Although Mr. Earman concedes, for the purposes of Count III, that the CSP was "partially funded" in FY 2004 through FY 2006 as a result of annual spending limitations, plaintiff argues that the CSP ceased to be "partially funded" in May 2007 when Congress enacted the Katrina Act and removed all annual spending limitations. *See* Pl.'s Mot. at 34; Pl.'s Reply at 17. In addition, plaintiff contends that, by enacting the 2008 Farm Bill and removing all multi-year limitations on CSP spending, Congress created an "indefinite appropriation" for the CSP, and therefore the Service's continued use of an additional tier-specific reduction factor constitutes a continuing violation of the implementing regulations and a breach of Mr. Earman's contract. *See* Pl.'s Mot. at 49-50 & n.59.

Defendant does not dispute that "[t]he Appendix to each CSP cont[r]act incorporates by reference the CSP implementing regulations set forth in 7 C.F.R. part 1469." Def.'s Mot. at 10 (citing Hubbs Decl. Ex. 1 at A00016 (Contract Appendix ¶ 13A)). As noted *supra*, the issue of whether the language quoted above is incorporated into plaintiff's contract is a question of law which the court must decide. *See, e.g.*, *Northrop Grumman*, 535 F.3d at 1343 (citations omitted); *Technicon Instruments*, 866 F.2d at 421-22 (citations omitted).

Although the court agrees that Mr. Earman's contract incorporates the Service's implementing regulations, the court does not agree with plaintiff that the Service's *discussion* of its interim final regulations is so incorporated. Plaintiff's contract incorporates only "[t]he regulations in 7 CFR part 1469." Hubbs Decl. Ex. 1 at A00016 (Contract Appendix ¶ 13A) ("The regulations in 7 CFR part 1469 for the CSP are incorporated, by reference, herein. In the event of a conflict between these regulations and the terms of this Appendix, the provisions of the regulations will prevail."). The language upon which plaintiff relies in Count III is not contained in the text of the regulations, but is, instead, within the Service's "[d]iscussion" of the regulations. *See* 69 Fed. Reg. at 34502 (introducing the Service's "Discussion of the Conservation Security Program Interim Final Rule"). Plaintiff excerpts a small portion of this commentary, which appears under a heading titled "The Administration's Response to Legislative Intent" and a subheading titled "Limiting Payments," and attempts to make use of this language as a contractual basis for his claim. Plaintiff's endeavor in that regard is

convoluted and, ultimately, decidedly unfruitful. Plaintiff cites no authority for the remarkable proposition that an agency's commentary regarding its regulations is equivalent to the regulations themselves, and what little pertinent authority the court has found appears to undermine plaintiff's position. *Cf. Peterson Builders, Inc. v. United States*, 26 Cl. Ct. 1227, 1229 n.3 (1992) (footnote omitted) (noting, in connection with defendant's motion for reconsideration, that "[w]hile the court [in its prior order] took guidance from the comments to the interim regulations, they are in no way binding upon the court"), *aff'd*, 155 F.3d 566 (Fed. Cir. 1998).

Ultimately, plaintiff fails to identify any actual regulation in support of his contention that the Service's regulations precluded its utilization of reduced rates after the enactment of the Katrina Act in 2007. Because plaintiff's breach of contract claim in Count III is based solely on the Service's discussion of its interim final regulations, which the court concludes is not incorporated into plaintiff's contract, plaintiff has failed to identify a contractual provision which plausibly entitles him to the additional payments he seeks in Count III.

### 3.  Are Mr. Earman's Breach of Contract Claims Reviewable in the Absence of Specific Contractual Provisions Allegedly Breached?  (Counts II and III)

Because plaintiff has failed to allege an obligation arising out of his contract which would entitle him to the additional payments he seeks in Counts II and III, the court must determine whether, in the absence of such contractual obligations, the CSP statute or its implementing regulations may serve as a money-mandating source of law which would permit the court to consider plaintiff's claims. The court has already answered that question in the negative. As the court held in *Meyers*, "the CSP – understood as encompassing the CSP statute and its implementing regulations – fails to meet any of the three prongs under *Samish II* and is therefore not a money-mandating source of law in this court." 96 Fed. Cl. at 60; *see* Def.'s Mot. at 11 n.5.

In apparent recognition of the court's jurisdictional holding in *Meyers*, plaintiff does not allege that he is entitled to relief in Counts II and III under the CSP statute and implementing regulations themselves without reference to specific terms of his contract. Nevertheless, plaintiff argues that the court "does have jurisdiction to rule on the validity of the agency's regulation[s]" because those

38

regulations "were incorporated into plaintiff's contract by reference and form the basis for the improper amounts both set forth in the contract of and paid to plaintiff (and each member of the yet-to-be certified class)." Pl.'s Mot. at 29 n.36. In support of this proposition, plaintiff cites the Federal Circuit's decisions in *Texas Health Choice v. Office of Personnel Management*, 400 F.3d 895 (Fed. Cir. 2005), and *GHS Health Maintenance Organization, Inc. v. United States*, 536 F.3d 1293 (Fed. Cir. 2008), and asserts that these cases "hold[] that, where the Court of Federal Claims has jurisdiction with respect to a contract claim it also has jurisdiction with regard to the validity of regulations related to it." Pl.'s Mot. at 29 n.36.

The court rejects plaintiff's alternative basis for jurisdiction over his claims in Counts II and III. Despite the incorporation of the CSP regulations into plaintiff's contract, *Texas Health* and *GHS Health* do not "hold" that this court has jurisdiction to rule on the validity of regulations merely because they are incorporated into a contract which is alleged to have been breached.

*Texas Health* and *GHS Health* involved contracts between health benefits carriers and the United States Office of Personnel Management (OPM) for health care benefits to federal employees pursuant to the Federal Employee Health Benefits Act, 5 U.S.C. §§ 8901-8914 (2012). In both cases, the plaintiffs challenged the validity of an OPM-promulgated regulation which mirrored the language of a provision in their contracts with OPM. *See GHS Health*, 536 F.3d at 1296; *Texas Health*, 400 F.3d at 897-98. In both cases, the Court of Federal Claims was found to possess exclusive jurisdiction over the plaintiffs' claims under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109 (Supp. V 2011), which is a money-mandating source of law sufficient to confer jurisdiction under the Tucker Act. *See Salt River Pima-Maricopa Indian Cmty. v. United States*, 86 Fed. Cl. 607, 616 (2009) (citing *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343-44 (Fed. Cir. 2008), and *United States Sur. Co. v. United States*, 83 Fed. Cl. 306, 309 (2008)). The CDA, however, "applies only to express or implied government contracts for procurement of goods or services." *Rick's Mushroom*, 521 F.3d at 1343-44. The CDA, therefore, has no application to the instant case, which involves a financial assistance agreement, not a procurement contract. *See* Hubbs Decl. Ex. 1 at A00016 (Contract Appendix ¶ 13E) ("This Contract is a financial assistance agreement, not a procurement contract and is governed by the terms set forth herein."); *cf. Wesleyan Co., Inc. v. Harvey*, 454 F.3d 1375, 1378

39

(Fed. Cir. 2006) ("'Procurement is the acquisition by purchase, lease or barter, of property or services for the *direct benefit or use* of the Federal Government.'" (quoting *New Era Constr. v. United States*, 890 F.2d 1152, 1157 (Fed. Cir. 1989))). Thus, *Texas Health* and *GHS Health* provide no authority for plaintiff's contention that this court may review the validity of the CSP implementing regulations.

> **4.    Is the Service's Methodology for Calculating Adjusted Base Payments in FY 2007 and Thereafter Entitled to Deference? (Count III)**

Even assuming, *arguendo*, that the Service's discussion of its interim final regulations is equivalent to the regulations themselves, and is therefore incorporated into Mr. Earman's contract by virtue of the incorporation language in paragraph 13A of the Contract Appendix, the court concludes that the Service's methodology for calculating adjusted base payments in FY 2007 and thereafter represents a reasonable interpretation of any ambiguity in the regulations and is entitled to deference.

Plaintiff contends that such deference is inappropriate because "[t]here is no agency interpretation involved with respect to Count III, *i.e.*, there is nothing to which deference need be given." Pl.'s Mot. at 34-35. In plaintiff's view, "[t]he resolution of this alternative count does not turn on the Court giving any deference to NRCS'[s] judgment as to how best to administer the CSP. . . . Rather, here defendant simply failed to follow the regulations that it adopted to operate the CSP." Pl.'s Reply at 15. Mr. Earman's argument in this regard is, essentially, that the Service, in its discussion of its interim final regulations, unambiguously stated that it would apply an additional reduction factor to its calculation of adjusted base payments *only* in fiscal years in which the CSP was "partially funded," *i.e.*, *only* in fiscal years in which Congress imposed annual or multi-year spending limitations on the Program. *See* Pl.'s Mot. at 33-34 (citing 69 Fed. Reg. at 34503); Pl.'s Reply at 18-19. In plaintiff's view, "contrary to the regulations, defendant continued to make such reduced payments even in those fiscal years when CCC was not subject to any spending limit and/or payment at the full amounts provided for by statute was possible." Pl.'s Reply at 19.

The court does not agree that the Service's discussion of its interim final regulations is as clear as plaintiff suggests. The Service stated that the interim final

40

regulations "adopt[ed] provisions of the proposed rule setting forth a mechanism for limiting payments for those years when the CSP is only partially funded."  69 Fed. Reg. at 34503.  This "mechanism" included provisions to "[r]educe stewardship (base) payments by applying a reduction factor."  *Id.*  Contrary to plaintiff's argument, the Service did *not* state that it would apply an additional reduction factor to its calculation of adjusted base payments *only* in those years in which the CSP is "partially funded."  Therefore, the plain language of the Service's discussion of its interim final regulations does not compel the court to adopt Mr. Earman's interpretation of that discussion.

Moreover, as the government notes in its reply brief, other portions of the regulatory history suggest that the Service's decision to use an additional reduction factor to calculate adjusted base payments was based on multiple factors in addition to spending limitations.  For instance, the Service stated in its notice of proposed rulemaking that applying a consistent reduction factor would result in greater Program participation and would incentivize CSP participants to engage in enhanced conservation practices:

> NRCS proposes to apply a consistent reduction factor to all regional rental rates to scale down the share of payments going to base payments (for all tiers of participation).  The more that program payments are made toward aspects directly related to additional environmental performance, rather than on base payments, more conservation is likely to be obtained.  The results of the CSP proposed rule economic analysis indicates that, all other payment held constant, the lower the reduction factor used on regional rental rates, the less the effect the base payment has on the overall producer payment.  This results in more net environmental benefits accruing to the program.  This will lower payments to producers, but does it in an equitable manner and allows more producers to participate within the available funding.  NRCS proposes that the base rate, once established, will be fixed over the life of the program.
>
> . . . .

41

Once local average 2001 rental rates for each land use
category are established, NRCS will then multiply those
average rental rates by a consistent reduction factor to
compute the final base rates.  The results of the CSP
proposed rule economic analysis indicated that, with all
other payments held constant, the lower the reduction
factor used on regional land rental rates, the less effect
the base payment has on the overall producer payment.
This results in more net environmental benefits accruing
to the program.  NRCS proposes a reduction factor to be
0.1, meaning that the final base rates will be 10 percent
of the local average rental rates.  NRCS believes this
discounting approach will help:

- Minimize the effect of the base payment on land
  rental rates, land values and commodity prices
- Maximize participation in the program
- Focus funds toward increased environmental
  performance through additional practices and
  enhancements payments
- Maximize environmental benefits and reduce
  program costs
- Continue to provide the participant with fair and
  equitable compensation for the social benefits
  derived from the contract.

69 Fed. Reg. 194, 199, 213 (Jan. 2, 2004); *see* Def.'s Reply at 26-27.  Likewise, in
its discussion of its interim final regulations, the Service again explained that
applying a consistent reduction factor would result in greater environmental
benefits:

NRCS will apply a consistent reduction factor to all
regional rental rates to scale down the share of payments
going to base payments (for all tiers of participation).
The more that total program payments are made toward
aspects directly related to additional environmental
performance, rather than on stewardship payments, the

42

> more positive conservation results are likely to be
> obtained. The results of the CSP proposed rule economic
> analysis indicated that, if all other payment[s] are held
> constant, the lower the reduction factor used on regional
> rental rates, the less the effect the stewardship payment
> has on the overall producer payment. This results in
> more net environmental benefits accruing from the
> program. This will lower payments to producers, but
> does it in an equitable manner and allows more producers
> to participate within the available funding. NRCS
> proposes that the stewardship rate, once established, will
> be fixed over the life of the program.

69 Fed. Reg. at 34509. In light of this regulatory history, the Service's discussion
of its interim final regulations is at least ambiguous with respect to whether an
additional reduction factor was to be applied *only* in those fiscal years in which
Congress had imposed annual or multi-year spending limitations on the Program.
The court must therefore decide whether the Service's continued use of an
additional reduction factor after the enactment of the Katrina Act constitutes a
reasonable interpretation of its ambiguous discussion of the interim final
regulations.

   "In situations in which the meaning of [regulatory] language is not free
from doubt," an agency's interpretation of its own regulations must be given effect
"so long as the interpretation sensibly conforms to the purpose and wording of the
regulations." *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S.
144, 150 (1991) (citations and internal quotation marks omitted); *accord Thomas
Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("We must give substantial
deference to an agency's interpretation of its own regulations.") (citations omitted);
*Princess Cruises, Inc. v. United States*, 201 F.3d 1352, 1359-60 (Fed. Cir. 2000).
"Deference is particularly appropriate when the agency is applying its regulations
to a complex or changing circumstance, thus requiring the agency to bring to bear
its unique expertise and policy-making prerogatives." *Southern California Edison*,
226 F.3d at 1357 (citing *Martin*, 499 U.S. at 151). When judicial deference is
appropriate, a court must accept the agency's reasonable interpretation of a
regulation, even if there may be other reasonable interpretations to which the
regulation is susceptible, and even if the court would have preferred an alternative

43

interpretation. *Id.* (citing *Sharp Corp. v. United States*, 63 F.3d 1092, 1096 (Fed. Cir. 1995)).

Mr. Earman argues that deference should not be afforded to the Service's methodology for calculating adjusted base payments in FY 2007 and thereafter because the government is itself a party to plaintiff's contract. *See* Pl.'s Mot. at 35 n.39 ("Moreover, *Chevron* deference may be inappropriate in situations such as this where the agency is an interested party to the agreement [alleged to have been breached]." (citing *Nat'l Fuel Gas Supply Corp. v. Fed. Energy Regulatory Comm'n*, 811 F.2d 1563, 1571 (D.C. Cir. 1987) (*National Fuel*), and *Chickaloon-Moose Creek Native Ass'n v. Norton*, 360 F.3d 972, 980 (9th Cir. 2004))). As the Federal Circuit noted in *Southern California Edison*, "[t]his argument is not without force" because a party entering a contract with the government "should reasonably expect to be on equal legal footing with the government should a dispute over the contract arise," and "[i]t would be unfair to give the government such a distinct advantage during an ordinary breach of contract litigation." 226 F.3d at 1357 (citing *National Fuel*, 811 F.2d at 1571). Nevertheless, as in *Southern California Edison*, the court concludes that the government's status as a party to plaintiff's contract does not preclude the application of deference in this instance.

First, despite the fact that the Service is charged with administering plaintiff's contract, *see* PPFUF ¶¶ 16, 53 (citing Hubbs Decl. Ex. 1 at A00016), it is not a party to the contract. Rather, plaintiff's contract, like all CSP contracts, is with the CCC. *See* Fourth Am. Compl. ¶ 64; PPFUF ¶ 49 (citing Hubbs Decl. Ex. 1 at A00008 ("THIS CONTRACT is entered between the Commodity Credit Corporation (referred to as 'CCC') and the undersigned owners, operators, or tenants . . . on the farm identified above.")). Indeed, as noted above, the CCC, not the Service, is the source of funds for the Program. *See* Fourth Am. Compl. ¶ 10; PPFUF ¶¶ 7-8. Therefore, the Service has no direct economic stake in the methodology used to calculate adjusted base payments to CSP participants. *Cf. Southern California Edison*, 226 F.3d at 1357 (applying deference to an agency's interpretation of regulations incorporated into contracts with private energy customers because, *inter alia*, "the agency was acting as a neutral arbiter resolving the customers' rights to the over-collected funds, rather than as an interested party to a contract" (citing *National Fuel*, 811 F.2d at 1571)).

44

Second, as in *Southern California Edison*, "the statutory and regulatory framework supports the application of judicial deference in this case." *See* 226 F.3d at 1358 (deferring to an agency's refund methodology, which involved an interpretation of its implementing regulations, because "Congress delegated significant responsibility for the administration of these energy contracts to the Secretary" and the agency's regulations "do not provide detailed guidance" regarding the specific refund methodology to be used). As noted *supra* and in the court's previous decision in *Meyers*, the 2002 Farm Bill and the CSP statute confer significant responsibility for the administration of CSP contracts to the Secretary of Agriculture, acting through the Service. *See* 16 U.S.C. § 3838a(a) (authorizing the Secretary to "establish" and "carry out" the CSP "as determined by the Secretary"); Pub. L. No. 107-171, tit. II, § 2001(b), 116 Stat. at 233 ("Not later than 270 days after the date of enactment of this Act, the Secretary of Agriculture shall promulgate regulations implementing the amendment made by subsection (a)."); *Meyers*, 96 Fed. Cl. at 53.

Likewise, the Service's implementing regulations do not mandate specific payment rates or amounts. As noted in *Meyers*, "while the regulations establish a general methodology for calculating adjusted base payments, the actual rates and payments are not set forth in the regulations, but are instead determined by the [Service] on an annual basis and published each year in the annual sign-up notice." 96 Fed. Cl. at 57 (citing 7 C.F.R. § 1469.23(a)(6)). Furthermore, in addition to conferring upon the Service discretion to establish the individual components of an annual payment, the implementing regulations provide that the Service "may limit the stewardship, practice, and enhancement components of CSP payments in order to focus funding toward targeted activities and conservation benefits [it] identifies in the sign-up notice and any subsequent addenda." 7 C.F.R. § 1469.23(g); *see Meyers*, 96 Fed. Cl. at 58. In sum, "[w]ithin the broad constraints set forth in the CSP statute and its regulations, the [Service] enjoys substantial discretion in setting the payment amounts under conservation security contracts." *Meyers*, 96 Fed. Cl. at 58. In light of the substantial discretion afforded the Service by the CSP statute and regulations, the role of this court is not to determine which payment methodology is most reasonable, but rather to ensure that the payment methodology selected by the Service is reasonable.

The court concludes that the Service's interpretation of its discussion of the interim final regulations, as reflected in its methodology for calculating adjusted base payments in FY 2007 and thereafter, is reasonable. As previously noted, the

45

implementing regulations and regulatory history contain no language limiting the application of additional reduction factors to only those years in which CSP spending was limited by Congress. To the contrary, the regulatory history clearly indicates that the Service's decision to apply an additional reduction factor was based on a variety of factors, of which only one was spending limitations imposed by Congress. *See* 69 Fed. Reg. at 199, 213, 34509; Def.'s Reply at 26-27. Most notably, the regulatory history indicates that the Service concluded, based on the "results of the CSP proposed rule economic analysis," that utilizing a consistent reduction factor would incentivize CSP participants to engage in enhanced conservation practices and would therefore "result[] in more net environmental benefits accruing from the program." 69 Fed. Reg. at 34509.

Additionally, even if the court were to assume the correctness of Mr. Earman's interpretation of the Service's discussion of its interim final regulations, the court agrees with defendant that the agency reasonably concluded that it remained constrained in its spending authority in FY 2007 and thereafter. *See* Def.'s Reply at 23-25, 27-28. It is undisputed that the CSP remained subject to spending limitations after the enactment of the Katrina Act, which left in place the multi-year limitations imposed by the Deficit Reduction Act of 2005. *See* Pub. L. No. 110-28, tit. IX, sec. 9010, § 20115, 121 Stat. at 218; Pl.'s Resp. to DPFUF ¶ 20; Def.'s Reply at 23-25. Moreover, the 2008 Farm Bill authorized the Service to carry out the CSP using only "such sums as are necessary to administer contracts entered into before September 30, 2008." Pub. L. No. 110-246, tit. II, subtit. D, sec. 2701, § 1241(a)(3), 122 Stat. at 1768 (codified at 16 U.S.C. § 3841(a)(3)(A)). As plaintiff's contract was executed before September 30, 2008, it was entirely reasonable for the Service to conclude that the 2008 Farm Bill required it to expend only such sums as necessary to pay plaintiff in accordance with the extant terms of his contract, which included the $2648 reduction set forth in Item 88 of the Schedule of Operations. Therefore, even if the Service had intended to apply an additional reduction factor only in fiscal years in which CSP spending was subject to limitations, the Service reasonably concluded that it remained subject to such limitations in FY 2007 and thereafter.

Accordingly, even if the Service's discussion of its interim final regulations were incorporated into Mr. Earman's contract, the Service's interpretation of that discussion, as reflected in its methodology for calculating adjusted base payments in FY 2007 and thereafter, is reasonable and must be given effect. For this

46

additional reason, plaintiff has failed to allege a plausible entitlement to the relief he seeks in Count III. Therefore, both Counts II and III fail to state claims upon which relief may be granted, and must be dismissed under RCFC 12(b)(6).

## C. Breach of Contract Claim Based on Alleged Right of Contract Renewal (Count IV)

In Count IV, plaintiff asserts that his contract provides a right of renewal because it incorporates the CSP statute, which plaintiff asserts required all CSP contracts to be renewable at the option of the contractor. Fourth Am. Compl. ¶¶ 16, 101-104. In this regard, plaintiff relies upon the following provision in the CSP statute:

> Except as provided in subparagraph (B) [applicable to Tier I contracts],[13] at the option of a producer, the conservation security contract of the producer may be renewed for an additional period of not less than 5 nor more than 10 years.

16 U.S.C. § 3838a(e)(4)(A); *see* Fourth Am. Compl. ¶ 16. Plaintiff alleges that the government anticipatorily breached this contractual right of renewal when Congress enacted the 2008 Farm Bill. Fourth Am. Compl. ¶¶ 102-103. As codified, the 2008 Farm Bill provides, in pertinent part, that "[a] conservation security contract may not be entered into or renewed under this subpart after September 30, 2008." 16 U.S.C. § 3838a(g)(1).

In its motion for summary judgment on Count IV, the government first argues that "Mr. Earman points to no provision in his CSP contract that provides any right of renewal." Def.'s Mot. at 29; *see also id.* at 28 ("There is no right to renew the CSP contracts on the face of the contract, in the Appendix that is part of the contract[,] or . . . in the [Service's] implementing regulations."). In addition, although the government "does not dispute that the CSP statute is incorporated into Mr. Earman's contract," Def.'s Reply at 29, it argues that the CSP statute does not confer a right of renewal, but rather provides plaintiff with only an "opportunity"

---

[13]/ It is undisputed that plaintiff never had a Tier I contract; Mr. Earman had a Tier II contract that was later modified to a Tier III contract. PPFUF ¶ 49.

to renew subject to the agency's ultimate approval, *see id.* at 29-32.  The government also argues that specific provisions in plaintiff's contract, including the implementing regulations which are incorporated by reference into the contract, prohibit the contract's automatic and unconditional renewal.  *See id.* at 31-32.  Furthermore, the government contends that even if plaintiff's contract includes a right of renewal, other provisions in the contract shield the government from liability for any alleged breach of that right.  *See* Def.'s Mot. at 29-30; Def.'s Reply at 33-34.  Finally, defendant argues that plaintiff is unable to establish the damages element of his claim because plaintiff cannot identify what terms and conditions would have been included in his renewed contract.  *See* Def.'s Reply at 34-35 & n.22.

The court agrees with defendant that there is no specific provision of plaintiff's contract which confers a right of renewal, but not for the reasons offered by defendant.  As explained *supra*, the court is not bound to accept the parties' stipulation that the CSP statute is incorporated into plaintiff's contract, and concludes as a matter of law that the CSP statute is *not* incorporated into plaintiff's contract.

The court has considered all of plaintiff's arguments to the contrary, and does not find them persuasive.  Plaintiff offers three arguments in support of his assertion that the renewal provision in 16 U.S.C. § 3838a(e)(4)(A) is incorporated into his contract.  First, plaintiff argues that the Service, during the notice and comment process, "publicly confirmed that the CSP contracts provided contractors with the right to renew" by stating that it declined to add a renewal provision to the implementing regulations because "renewal was fully provided for by the [CSP] statute."  Pl.'s Mot. at 54-55 (citing 69 Fed. Reg. at 34519 and 70 Fed. Reg. 15201, 15202 (Mar. 25, 2005)).  In this regard, plaintiff asserts that because his contract expressly incorporates the implementing regulations, *see* Hubbs Decl. Ex. 1 at A00016 (Contract Appendix ¶ 13A), it also incorporates the Service's alleged "understanding that renewal of CSP contracts was provided for by the CSP statute," Pl.'s Mot. at 55.  As explained *supra*, however, although plaintiff's contract expressly incorporates the Service's implementing regulations, it does not incorporate the Service's discussion of its interim final regulations.

Second, plaintiff reiterates his contention – based upon *Roedler*, *Dalles*, and *Nebraska Public Power* – that because his contract implements the CSP statute, his

48

contract must be interpreted in light of the CSP statute and may not contradict the CSP statute.  *See* Pl.'s Mot. at 55.  Again, as explained *supra*, the court finds these authorities inapposite and unavailing.

Finally, plaintiff argues that 16 U.S.C. § 3838a(e)(4)(A) is incorporated by implication into his contract under the so-called "*Christian* Doctrine," first articulated by the Court of Claims in *G.L. Christian & Associates v. United States*, 312 F.2d 418 (Ct. Cl. 1963), which provides that parties to a government contract are deemed to have agreed to contract terms required by law to be included in the contract.  *See* Pl.'s Mot. at 55-56 (citing *Coll. Point Boat Corp. v. United States*, 267 U.S. 12 (1925), and *Enron Fed. Solutions, Inc. v. United States*, 80 Fed. Cl. 382, 392 n.11 (2008) (citing *Christian*)).  This argument is similarly unpersuasive. "[T]he *Christian* Doctrine does not permit the automatic incorporation of every required contract clause."  *Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993).  Rather, it applies only to "mandatory contract clauses which express a significant or deeply ingrained strand of public procurement policy."  *Id.* (citations omitted); *see also S.J. Amoroso Constr. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993) ("Under the *Christian* doctrine, a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law.") (citations omitted).  As explained *supra*, the CSP involves financial assistance agreements, not procurement contracts.  Thus, the *Christian* doctrine is not applicable to this case and is of no avail to plaintiff.

Plaintiff's breach of contract claim in Count IV is based solely on the incorporation of 16 U.S.C. § 3838a(e)(4)(A) into plaintiff's contract.  There are no disputed facts regarding this claim.  Because the CSP statute is not incorporated into plaintiff's contract, as a matter of law, defendant is entitled to summary judgment on Count IV.

### D.    Takings Claim (Count V)

In Count V, plaintiff alleges, in the alternative to Count IV, that the government's abrogation of his alleged contractual right of renewal effected an uncompensated taking in violation of the Fifth Amendment to the United States Constitution.  *See* Fourth Am. Compl. ¶¶ 105-110.

49

This court has jurisdiction over takings claims brought against the federal government under the Tucker Act. *See Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008) ("It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction.") (citation omitted). However, before determining whether a particular governmental action has effected a taking of private property requiring the payment of just compensation, "as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment." *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004); *see also Colvin Cattle Co. v. United States*, 468 F.3d 803, 806 (Fed. Cir. 2006) (noting that "under our regulatory takings analysis, the threshold inquiry is whether the claimant has established a 'property interest' for purposes of the Fifth Amendment") (citation and internal quotation marks omitted). If the undisputed facts show that the interest alleged to have been taken is not a cognizable property right to which the Takings Clause of the Fifth Amendment applies, then plaintiff's takings claim fails as a matter of law.

Plaintiff asserts that he has a cognizable property interest in his alleged contractual right of renewal. *See* Fourth Am. Compl. ¶ 106; Pl.'s Mot. at 65. Although contractual rights are cognizable property interests protected by the Takings Clause of the Fifth Amendment, *see, e.g.*, *Century Exploration New Orleans, Inc. v. United States*, 103 Fed. Cl. 70, 76 (2012), the court has already concluded that plaintiff's contract does not confer a right of renewal because the CSP statute is not incorporated into plaintiff's contract. Moreover, to the extent that plaintiff bases his asserted property interest in the CSP statute itself, rather than in his contract, plaintiff has not cited a single case in which a court has held that the denial of monetary benefits under a government program constitutes a taking requiring compensation under the Fifth Amendment. Indeed, in *Meyers*, the court rejected the plaintiffs' argument that they possessed a property right in monetary benefits under the CSP. *See* 96 Fed. Cl. at 62 ("[T]he court holds that plaintiffs do not possess any property rights in monetary benefits under the CSP."); *cf. Adams v. United States*, 391 F.3d 1212, 1225 (Fed. Cir. 2004) ("We decline to treat a statutory right to be paid money as a legally-recognized property interest, as we would real property, physical property, or intellectual property. Instead, we view it as nothing more than an allegation that money is owed."). Because

50

plaintiff has failed to identify a cognizable property interest under the Takings Clause, defendant is entitled to summary judgment on Count V.[14]

### E. Motion for Class Certification

In *Greenlee County v. United States*, 487 F.3d 871 (Fed. Cir. 2007), the Federal Circuit affirmed the decision of the Court of Federal Claims finding the issue of class certification moot because all of the plaintiff's claims had been dismissed. 487 F.3d at 880-81. The Federal Circuit noted that it had "repeatedly found on appeal that issues related to class certification were moot in light of [its] resolution against the plaintiff of a motion to dismiss or for summary judgment" and saw "no reason to apply a different rule when it is the Court of Federal Claims that finds the issue moot." *Id.* at 880. Having dismissed each count of Mr. Earman's Fourth Amended Complaint, the court also denies as moot plaintiff's pending motion for class certification. *See id.*; *Meyers*, 96 Fed. Cl. at 42 n.6 ("Because plaintiffs' complaint is dismissed in its entirety, the motions for class certification and to amend the pleadings are dismissed as moot." (citing *Greenlee County*, 487 F.3d at 880)).

### CONCLUSION

For all of the foregoing reasons, the court hereby grants defendant's motion to dismiss Counts II and III, grants defendant's motion for summary judgment on Counts I, IV, and V, and denies plaintiff's cross-motion for summary judgment on all counts.

Accordingly, it is hereby **ORDERED** that

(1) Defendant's Revised Motion to Dismiss and Motion for Summary Judgment, filed February 1, 2013, is **GRANTED**;

---

[14]/ In his reply brief, plaintiff "requests that the Court stay the filing of plaintiff's reply brief on Count V and disposition of Count V pending resolution of the issues in Count IV." Pl.'s Reply at 30. Because plaintiff was afforded a full opportunity to brief summary judgment arguments regarding his takings claim, and because that claim fails as a matter of law, the court denies plaintiff's request for a "stay."

51

(2)     Plaintiff's Cross-Motion for Summary Judgment, filed March 20, 2013, is **DENIED**;

(3)     Plaintiff's Motion for Class Certification, filed September 30, 2010, is **DENIED** as moot;

(4)     The Clerk's Office is directed to **ENTER** final judgment in favor of defendant, **DISMISSING** the Fourth Amended Complaint with prejudice; and

(5)     Each party shall bear its own costs.

/s/Lynn J. Bush
LYNN J. BUSH
Senior Judge

52

**Add.52**

# CHAPTER 2—CONSERVATION SECURITY AND FARMLAND PROTECTION

## Subchapter A—Conservation Security Program

**16 USCA § 3838**

**"SEC. 1238. DEFINITIONS.**

"In this subchapter:

"(1) BASE PAYMENT.—The term 'base payment' means an amount that is—

"(A) determined in accordance with the rate described in section 1238C(b)(1)(A); and

"(B) paid to a producer under a conservation security contract in accordance with clause (i) of subparagraph (C), (D), or (E) of section 1238C(b)(1), as appropriate.

"(2) BEGINNING FARMER OR RANCHER.—The term 'beginning farmer or rancher' has the meaning given the term under section 343(a) of the Consolidated Farm and Rural Development Act (7 U.S.C. 1991(a)).

"(3) CONSERVATION PRACTICE.—The term 'conservation practice' means a conservation farming practice described in section 1238A(d)(4) that—

"(A) requires planning, implementation, management, and maintenance; and

"(B) promotes 1 or more of the purposes described in section 1238A(a).

"(4) CONSERVATION SECURITY CONTRACT.—The term 'conservation security contract' means a contract described in section 1238A(e).

"(5) CONSERVATION SECURITY PLAN.—The term 'conservation security plan' means a plan described in section 1238A(c).

"(6) CONSERVATION SECURITY PROGRAM.—The term 'conservation security program' means the program established under section 1238A(a).

"(7) ENHANCED PAYMENT.—The term 'enhanced payment' means the amount paid to a producer under a conservation security contract that is equal to the amount described in section 1238C(b)(1)(C)(iii).

"(8) NONDEGRADATION STANDARD.—The term 'nondegradation standard' means the level of measures required to adequately protect, and prevent degradation of, 1 or more natural resources, as determined by the Secretary in accordance with the quality criteria described in handbooks of the Natural Resources Conservation Service.

"(9) PRODUCER.—

"(A) IN GENERAL.—The term 'producer' means an owner, operator, landlord, tenant, or sharecropper that—

"(i) shares in the risk of producing any crop or livestock; and

**Add.53**

"(ii) is entitled to share in the crop or livestock available for marketing from a farm (or would have shared had the crop or livestock been produced).

"(B) HYBRID SEED GROWERS.—In determining whether a grower of hybrid seed is a producer, the Secretary shall not take into consideration the existence of a hybrid seed contract.

"(10) RESOURCE–CONSERVING CROP ROTATION.—The term 'resource-conserving crop rotation' means a crop rotation that—

"(A) includes at least 1 resource-conserving crop (as defined by the Secretary);

"(B) reduces erosion;

"(C) improves soil fertility and tilth;

"(D) interrupts pest cycles; and

"(E) in applicable areas, reduces depletion of soil moisture (or otherwise reduces the need for irrigation).

"(11) RESOURCE MANAGEMENT SYSTEM.—The term 'resource management system' means a system of conservation practices and management relating to land or water use that is designed to prevent resource degradation and permit sustained use of land, water, and other natural resources, as defined in accordance with the technical guide of the Natural Resources Conservation Service.

"(12) SECRETARY.—The term 'Secretary' means the Secretary of Agriculture, acting through the Chief of the Natural Resources Conservation Service.

"(13) TIER I CONSERVATION SECURITY CONTRACT.—The term 'Tier I conservation security contract' means a contract described in section 1238A(d)(5)(A).

"(14) TIER II CONSERVATION SECURITY CONTRACT.—The term 'Tier II conservation security contract' means a contract described in section 1238A(d)(5)(B).

"(15) TIER III CONSERVATION SECURITY CONTRACT.—The term 'Tier III conservation security contract' means a contract described in section 1238A(d)(5)(C).

**16 USCA § 3838a**

**"SEC. 1238A. CONSERVATION SECURITY PROGRAM.**

"(a) IN GENERAL.—The Secretary shall establish and, for each of fiscal years 2003 through 2007, carry out a conservation security program to assist producers of agricultural operations in promoting, as is applicable with respect to land to be enrolled in the program, conservation and improvement of the quality of soil,

water, air, energy, plant and animal life, and any other conservation purposes, as determined by the Secretary.

"(b) ELIGIBILITY.—

"(1) ELIGIBLE PRODUCERS.—To be eligible to participate in the conservation security program (other than to receive technical assistance under section 1238C(g) for the development of conservation security contracts), a producer shall—

"(A) develop and submit to the Secretary, and obtain the approval of the Secretary of, a conservation security plan that meets the requirements of subsection (c)(1); and

"(B) enter into a conservation security contract with the Secretary to carry out the conservation security plan.

"(2) ELIGIBLE LAND.—Except as provided in paragraph (3), private agricultural land (including cropland, grassland, prairie land, improved pasture land, and rangeland), land under the jurisdiction of an Indian tribe (as defined by the Secretary), and forested land that is an incidental part of an agricultural operation shall be eligible for enrollment in the conservation security program.

"(3) EXCLUSIONS.—

"(A) CONSERVATION RESERVE PROGRAM.—Land enrolled in the conservation reserve program under subchapter B of chapter 1 shall not be eligible for enrollment in the conservation security program.

"(B) WETLANDS RESERVE PROGRAM.—Land enrolled in the wetlands reserve program established under subchapter C of chapter 1 shall not be eligible for enrollment in the conservation security program.

"(C) GRASSLAND RESERVE PROGRAM.—Land enrolled in the grassland reserve program established under subchapter C of chapter 2 shall not be eligible for enrollment in the conservation security program.

"(D) CONVERSION TO CROPLAND.—Land that is used for crop production after the date of enactment of this subchapter that had not been planted, considered to be planted, or devoted to crop production for at least 4 of the 6 years preceding that date (except for land enrolled in the conservation reserve program under subchapter B of chapter 1) or that has been maintained using long-term crop rotation practices, as determined by the Secretary, shall not be the basis for any payment under the conservation security program.

"(4) ECONOMIC USES.—The Secretary shall permit a producer to implement, with respect to all eligible land covered by a conservation security plan, economic uses that—

"(A) maintain the agricultural nature of the land; and

"(B) are consistent with the natural resource and conservation objectives of the conservation security program.

"(c) CONSERVATION SECURITY PLANS.—

"(1) IN GENERAL.—A conservation security plan shall—

"(A) identify the designated land and resources to be conserved under the conservation security plan;

"(B) describe the tier of conservation security contract, and the particular conservation practices to be implemented, maintained, or improved, in accordance with subsection (d) on the land covered by the conservation security contract for the specified term; and

"(C) contain a schedule for the implementation, maintenance, or improvement of the conservation practices described in the conservation security plan during the term of the conservation security contract.

"(2) RESOURCE PLANNING.—The Secretary may assist producers that enter into conservation security contracts in developing a comprehensive, long-term strategy for improving and maintaining all natural resources of the agricultural operation of the producer.

"(d) CONSERVATION CONTRACTS AND PRACTICES.—

"(1) IN GENERAL.—

"(A) ESTABLISHMENT OF TIERS.—The Secretary shall establish, and offer to eligible producers, 3 tiers of conservation contracts under which a payment under this subchapter may be received.

"(B) ELIGIBLE CONSERVATION PRACTICES.—

"(i) IN GENERAL.—The Secretary shall make eligible for payment under a conservation security contract land management, vegetative, and structural practices.

"(ii) DETERMINATION.—In determining the eligibility of a practice described in clause (i), the Secretary shall require, to the maximum extent practicable, that the lowest cost alternatives be used to fulfill the purposes of the conservation security plan, as determined by the Secretary.

"(2) ON–FARM RESEARCH AND DEMONSTRATION OR PILOT TESTING.—With respect to land enrolled in the conservation security program, the Secretary may approve a conservation security plan that includes—

"(A) on–farm conservation research and demonstration activities; and

"(B) pilot testing of new technologies or innovative conservation practices.

"(3) USE OF HANDBOOK AND GUIDES; STATE AND LOCAL CONSERVATION CONCERNS.—

"(A) USE OF HANDBOOK AND GUIDES.—In determining eligible conservation practices and the criteria for implementing or maintaining the conservation practices under the conservation security program, the Secretary shall use the National Handbook of Conservation Practices of the Natural Resources Conservation Service.

"(B) STATE AND LOCAL CONSERVATION PRIORITIES.—The conservation priorities of a State or locality in which an agricultural operation is situated shall be determined by the State Conservationist, in consultation with—

"(i) the State technical committee established under subtitle G; and

"(ii) local agricultural producers and conservation working groups.

"(4) CONSERVATION PRACTICES.—Conservation practices that may be implemented by a producer under a conservation security contract (as appropriate for the agricultural operation of a producer) include—

"(A) nutrient management;

"(B) integrated pest management;

"(C) water conservation (including through irrigation) and water quality management;

"(D) grazing, pasture, and rangeland management;

"(E) soil conservation, quality, and residue management;

"(F) invasive species management;

"(G) fish and wildlife habitat conservation, restoration, and management;

"(H) air quality management;

"(I) energy conservation measures;

"(J) biological resource conservation and regeneration;

"(K) contour farming;

"(L) strip cropping;

"(M) cover cropping;

"(N) controlled rotational grazing;

"(O) resource–conserving crop rotation;

"(P) conversion of portions of cropland from a soil-depleting use to a soil-conserving use, including production of cover crops;

"(Q) partial field conservation practices;

"(R) native grassland and prairie protection and restoration; and

"(S) any other conservation practices that the Secretary determines to be appropriate and comparable to other conservation practices described in this paragraph.

"(5) TIERS.—Subject to paragraph (6), to carry out this subsection, the Secretary shall establish the following 3 tiers of conservation contracts:

"(A) TIER I CONSERVATION SECURITY CONTRACTS.—A conservation security plan for land enrolled under a Tier I conservation security contract shall—

"(i) be for a period of 5 years; and

"(ii) include conservation practices appropriate for the agricultural operation, that, at a minimum (as determined by the Secretary)—

"(I) address at least 1 significant resource of concern for the enrolled portion of the agricultural operation at a level that meets the appropriate nondegradation standard; and

"(II) cover active management of conservation practices that are implemented or maintained under the conservation security contract.

"(B) TIER II CONSERVATION SECURITY CONTRACTS.—A conservation security plan for land enrolled under a Tier II conservation security contract shall—

"(i) be for a period of not less than 5 nor more than 10 years, as determined by the producer;

"(ii) include conservation practices appropriate for the agricultural operation, that, at a minimum—

"(I) address at least 1 significant resource of concern for the entire agricultural operation, as determined by the Secretary, at a level that meets the appropriate nondegradation standard; and

"(II) cover active management of conservation practices that are implemented or maintained under the conservation security contract.

"(C) TIER III CONSERVATION SECURITY CONTRACTS.—A conservation security plan for land enrolled under a Tier III conservation security contract shall—

"(i) be for a period of not less than 5 nor more than 10 years, as determined by the producer; and

"(ii) include conservation practices appropriate for the agricultural operation that, at a minimum—

"(I) apply a resource management system that meets the appropriate nondegradation standard for all resources of concern of the entire agricultural operation, as determined by the Secretary; and

"(II) cover active management of conservation practices that are implemented or maintained under the conservation security contract.

"(6) MINIMUM REQUIREMENTS.—The minimum requirements for each tier of conservation contracts implemented under paragraph (5) shall be determined and approved by the Secretary.

"(e) CONSERVATION SECURITY CONTRACTS.—

"(1) IN GENERAL.—On approval of a conservation security plan of a producer, the Secretary shall enter into a conservation security contract with the producer to enroll the land covered by the conservation security plan in the conservation security program.

"(2) MODIFICATION.—

"(A) OPTIONAL MODIFICATIONS.—A producer may apply to the Secretary for a modification of the conservation security contract of the producer that is consistent with the purposes of the conservation security program.

"(B) OTHER MODIFICATIONS.—

"(i) IN GENERAL.—The Secretary may, in writing, require a producer to modify a conservation security contract before the expiration of the conservation security contract if the Secretary determines that a change made to the type, size, management, or other aspect of the agricultural operation of the producer would, without the modification of the contract, significantly interfere with achieving the purposes of the conservation security program.

"(ii) PARTICIPATION IN OTHER PROGRAMS.—If appropriate payment reductions and other adjustments (as determined by the Secretary) are made to the conservation security contract of a producer, the producer may—

"(I) simultaneously participate in—

"(aa) the conservation security program;

"(bb) the conservation reserve program under subchapter B of chapter 1; and

"(cc) the wetlands reserve program under subchapter C of chapter 1; and

"(II) may remove land enrolled in the conservation security program for enrollment in a program described in item (bb) or (cc) of subclause (I).

"(3) TERMINATION.—

"(A) OPTIONAL TERMINATION.—A producer may terminate a conservation security contract and retain payments received under the conservation security contract, if—

"(i) the producer is in full compliance with the terms and conditions (including any maintenance requirements) of the conservation security contract as of the date of the termination; and

"(ii) the Secretary determines that termination of the contract would not defeat the purposes of the conservation security plan of the producer.

"(B) OTHER TERMINATION.—A producer that is required to modify a conservation security contract under paragraph (2)(B)(i) may, in lieu of modifying the contract—

"(i) terminate the conservation security contract; and

"(ii) retain payments received under the conservation security contract, if the producer has fully complied with the terms and conditions of the conservation security contract before termination of the contract, as determined by the Secretary.

"(4) RENEWAL.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), at the option of a producer, the conservation security contract of the producer may be renewed for an additional period of not less than 5 nor more than 10 years.

"(B) TIER I RENEWALS.—In the case of a Tier I conservation security contract of a producer, the producer may renew the contract only if the producer agrees—

"(i) to apply additional conservation practices that meet the nondegradation standard on land already enrolled in the conservation security program; or

"(ii) to adopt new conservation practices with respect to another portion of the agricultural operation that address resource concerns and meet the nondegradation standard under the terms of the Tier I conservation security contract.

"(f) NONCOMPLIANCE DUE TO CIRCUMSTANCES BEYOND THE CONTROL OF PRODUCERS.—The Secretary shall include in the conservation security contract a provision, and may permit modification of a conservation security contract under subsection (e)(1), to ensure that a producer shall not be considered in violation of a conservation security contract for failure to comply with the conservation security contract due to circumstances beyond the control of the producer, including a disaster or related condition, as determined by the Secretary.

**USCA § 3838b**

**"SEC. 1238B. DUTIES OF PRODUCERS.**

"Under a conservation security contract, a producer shall agree, during the term of the conservation security contract—

"(1) to implement the applicable conservation security plan approved by the Secretary;

"(2) to maintain, and make available to the Secretary at such times as the Secretary may request, appropriate records showing the effective and timely implementation of the conservation security plan;

"(3) not to engage in any activity that would interfere with the purposes of the conservation security program; and

"(4) on the violation of a term or condition of the conservation security contract—

"(A) if the Secretary determines that the violation warrants termination of the conservation security contract—

"(i) to forfeit all rights to receive payments under the conservation security contract; and

"(ii) to refund to the Secretary all or a portion of the payments received by the producer under the conservation security contract, including any advance payments and interest on the payments, as determined by the Secretary; or

"(B) if the Secretary determines that the violation does not warrant termination of the conservation security contract, to refund to the Secretary, or accept adjustments

to, the payments provided to the producer, as the Secretary determines to be appropriate.

**16 USCA § 3838c**

**"SEC. 1238C. DUTIES OF THE SECRETARY.**

"(a) TIMING OF PAYMENTS.—The Secretary shall make payments under a conservation security contract as soon as practicable after October 1 of each fiscal year.

"(b) ANNUAL PAYMENTS.—

"(1) CRITERIA FOR DETERMINING AMOUNT OF PAYMENTS.—

"(A) BASE PAYMENT.—A base payment under this paragraph shall be (as determined by the Secretary)—

"(i) the average national per-acre rental rate for a specific land use during the 2001 crop year; or

"(ii) another appropriate rate for the 2001 crop year that ensures regional equity.

"(B) PAYMENTS.—A payment for a conservation practice under this paragraph shall be determined in accordance with subparagraphs (C) through (E).

"(C) TIER I CONSERVATION SECURITY CONTRACTS.—The payment for a Tier I conservation security contract shall consist of the total of the following amounts:

"(i) An amount equal to 5 percent of the applicable base payment for land covered by the contract.

"(ii) An amount that does not exceed 75 percent (or, in the case of a beginning farmer or rancher, 90 percent) of the average county costs of practices for the 2001 crop year that are included in the conservation security contract, as determined by the Secretary, including the costs of—

"(I) the adoption of new management, vegetative, and land-based structural practices;

"(II) the maintenance of existing land management and vegetative practices; and

"(III) the maintenance of existing land-based structural practices that are approved by the Secretary but not already covered by a Federal or State maintenance requirement.

"(iii) An enhanced payment that is determined by the Secretary in a manner that ensures equity across regions of the United States, if the producer—

"(I) implements or maintains multiple conservation practices that exceed minimum requirements for the applicable tier of participation (including practices that involve a change in land use, such as resource-conserving crop rotation, managed rotational grazing, or conservation buffer practices);

"(II) addresses local conservation priorities in addition to resources of concern for the agricultural operation;

"(III) participates in an on-farm conservation research, demonstration, or pilot project;

"(IV) participates in a watershed or regional resource conservation plan that involves at least 75 percent of producers in a targeted area; or

"(V) carries out assessment and evaluation activities relating to practices included in a conservation security plan.

"(D) TIER II CONSERVATION SECURITY CONTRACTS.—The payment for a Tier II conservation security contract shall consist of the total of the following amounts:

"(i) An amount equal to 10 percent of the applicable base payment for land covered by the conservation security contract.

"(ii) An amount that does not exceed 75 percent (or, in the case of a beginning farmer or rancher, 90 percent) of the average county cost of adopting or maintaining practices for the 2001 crop year that are included in the conservation security contract, as described in subparagraph (C)(ii).

"(iii) An enhanced payment that is determined in accordance with subparagraph (C)(iii).

"(E) TIER III CONSERVATION SECURITY CONTRACTS.—The payment for a Tier III conservation security contract shall consist of the total of the following amounts:

"(i) An amount equal to 15 percent of the base payment for land covered by the conservation security contract.

"(ii) An amount that does not exceed 75 percent (or, in the case of a beginning farmer or rancher, 90 percent) of the average county cost of adopting or maintaining practices for the 2001 crop year that are included in the conservation security contract, as described in subparagraph (C)(ii).

"(iii) An enhanced payment that is determined in accordance with subparagraph (C)(iii).

"(2) LIMITATION ON PAYMENTS.—

"(A) IN GENERAL.—Subject to paragraphs (1) and (3), the Secretary shall make an annual payment, directly or indirectly, to an individual or entity covered by a conservation security contract in an amount not to exceed—

"(i) in the case of a Tier I conservation security contract, $20,000;

"(ii) in the case of a Tier II conservation security contract, $35,000; or

"(iii) in the case of a Tier III conservation security contract, $45,000.

"(B) LIMITATION ON BASE PAYMENTS.—In applying the payment limitation under each of clauses (i), (ii), and (iii) of subparagraph (A), an individual or entity may not receive, directly or indirectly, payments described in

clause (i) of paragraph (1)(C), (1)(D), or (1)(E), as appropriate, in an amount that exceeds—

 "(i) in the case of Tier I contracts, 25 percent of the applicable payment limitation; or

 "(ii) in the case of Tier II contracts and Tier III contracts, 30 percent of the applicable payment limitation.

 "(C) OTHER USDA PAYMENTS.—A producer shall not receive payments under the conservation security program and any other conservation program administered by the Secretary for the same practices on the same land.

 "(D) COMMENSURATE SHARE.—To be eligible to receive a payment under this subchapter, an individual or entity shall make contributions (including contributions of land, labor, management, equipment, or capital) to the operation of the farm that are at least commensurate with the share of the proceeds of the operation of the individual or entity.

 "(3) EQUIPMENT OR FACILITIES.—A payment to a producer under this subchapter shall not be provided for—

 "(A) construction or maintenance of animal waste storage or treatment facilities or associated waste transport or transfer devices for animal feeding operations; or

 "(B) the purchase or maintenance of equipment or a non-land based structure that is not integral to a land-based practice, as determined by the Secretary.

 "(c) MINIMUM PRACTICE REQUIREMENT.—In determining a payment under subsection (b) for a producer that receives a payment under another program administered by the Secretary that is contingent on complying with requirements under subtitle B or C (relating to the use of highly erodible land or wetland), a payment under this subchapter on land subject to those requirements shall be for practices only to the extent that the practices exceed minimum requirements for the producer under those subtitles, as determined by the Secretary.

 "(d) REGULATIONS.—The Secretary shall promulgate regulations that—

 "(1) provide for adequate safeguards to protect the interests of tenants and sharecroppers, including provision for sharing payments, on a fair and equitable basis; and

 "(2) prescribe such other rules as the Secretary determines to be necessary to ensure a fair and reasonable application of the limitations established under subsection (b).

 "(e) TRANSFER OR CHANGE OF INTEREST IN LAND SUBJECT TO CONSERVATION SECURITY CONTRACT.—

 "(1) IN GENERAL.—Except as provided in paragraph (2), the transfer, or change in the interest, of a producer in land subject to a conservation security contract shall result in the termination of the conservation security contract.

   "(2) TRANSFER OF DUTIES AND RIGHTS.—Paragraph (1) shall not apply if, not later than 60 days after the date of the transfer or change in the interest in land, the transferee of the land provides written notice to the Secretary that all duties and rights under the conservation security contract have been transferred to, and assumed by, the transferee.

   "(f) ENROLLMENT PROCEDURE.—In entering into conservation security contracts with producers under this subchapter, the Secretary shall not use competitive bidding or any similar procedure.

   "(g) TECHNICAL ASSISTANCE.—For each of fiscal years 2003 through 2007, the Secretary shall provide technical assistance to producers for the development and implementation of conservation security contracts, in an amount not to exceed 15 percent of amounts expended for the fiscal year.".

**7 C.F.R. § 1469.23**
**§ 1469.23 Program payments.**

(a) Stewardship component of CSP payments.

(1) The conservation stewardship plan, as applicable, divides the land area to be enrolled in the CSP into land use categories, such as irrigated and non-irrigated cropland, irrigated and non-irrigated pasture, pastured cropland and range land, among other categories.

(2) NRCS will determine an appropriate stewardship payment rate for each land use category using the following methodology:

(i) NRCS will initially calculate the average 2001 rates using the Agriculture Foreign Investment Disclosure Act (AFIDA) Land Value Survey, the National Agriculture Statistics Service (NASS) land rental data, and Conservation Reserve Program (CRP) rental rates.

(ii) Where typical rental rates for a given land use vary widely within a State or between adjacent States, NRCS will adjust the county-level rates to ensure local and regional consistency and equity.

(iii) The State Conservationists can also contribute additional local data, with advice from the State Technical Committee.

(iv) The final stewardship payment rate will be the adjusted regional rates described in paragraph (a)(2)(i) through (iii) of this section multiplied by a reduction factor of 0.25 for Tier I, 0.50 for Tier II, and 0.75 for Tier III.

(v) Pastured cropland will receive the same stewardship payment as cropland.

(3) NRCS will compute the stewardship component of the CSP payment as the product of: the number of acres in each land use category (not including "other" or land not in the applicant's control); the corresponding stewardship payment rate for the applicable acreage; and a tier-specific percentage. The tier-specific percentage is 5 percent for Tier I payments, 10 percent for Tier II payments, and 15 percent for Tier III payments.

(4) Other incidental parcels as defined in § 1469.5(d)(1)(iv) may be given a stewardship rate as though they were the land use to which they are contiguous if they are serving a conservation purpose, such as wildlife habitat. Payment is limited to not more than ten percent of the contract acres. Minimum treatment requirements for the contract tier apply.

(5) Other land, as defined in § 1469.5(d)(1)(v), is not included in the stewardship payment computation.

(6) NRCS will publish the stewardship payment rates at the announcement of each program sign-up.

(b) Existing practice component of CSP payments.

(1) The Chief will determine and announce which practices will be eligible for existing practice payments in accordance with § 1469.8(a).

(2) With exceptions including, but not limited to, paragraph (b)(3) and (4) of this section, NRCS may pay the participant a percentage of the average 2001 county cost of maintaining a land management, and structural practice that is documented in the benchmark condition inventory as existing upon enrollment in CSP. The Chief may offer alternative payment methods such as paying a percentage of the stewardship payment as long as the payment will not exceed 75 percent (or, in the case of a beginning farmer or rancher, 90 percent) of the average 2001 county costs of installing the practice in the 2001 crop year. NRCS will post the rates for payment at the time of the sign-up notices on the NRCS website and in USDA Service Centers.

(3) NRCS will not pay for maintenance of equipment.

(4) NRCS will not pay an existing practice component of CSP payments for any practice that is required to meet conservation compliance requirements found in 7 CFR Part 12.

(5) Existing practice payments are not intended to pay for routine maintenance activities related to production practices or practices considered typical in farm and ranch operations for a specific location.

(6) Existing practice payments will be made only on practices that meet or exceed the practice standards described in the FOTG.

(7) The Chief may reduce the rates in any given sign-up notice.

(c) New practice payments.

(1) The Chief will determine and announce which practices will be eligible for new practice payments in accordance with § 1469.8(a).

(2) If the conservation stewardship contract requires the implementation of a new structural or land management practice, NRCS may pay a percentage of the cost of installing the new practice. NRCS will provide the list of approved practices and the percentage cost-share rate for each practice at the time of each CSP sign-up notice.

(3) Participants may contribute to their share of the cost of installing a new practice through in-kind sources, such as personal labor, use of personal equipment, or donated materials. Contributions for a participant's share of the practice may also be provided from non–Federal sources, as determined by the Chief.

(4) Cost-share payments may be provided by other programs; except that payments may not be provided through CSP and another program for the same practice on the same land area.

(5) If additional practices are installed or implemented to advance a contract from one tier of participation to a higher tier, the practice must be certified as meeting FOTG practice standards by NRCS.

(6) In no instance will the total financial contributions for installing a practice from all public and private entity sources exceed 100 percent of the actual cost of installing the practice.

(7) NRCS will not pay a new practice payment for any practice that is required to meet the conservation compliance plan requirements found in 7 CFR Part 12.

(8) The Chief may reduce the rates in any given sign-up notice.

(d) Enhancement component of CSP payments.

(1) The Chief will establish a list of conservation practices and activities that are eligible for enhancement payments for a given sign-up. State Conservationists, with advice from the State Technical Committees, will tailor the list to meet the needs of the selected watersheds and submit to the Chief for concurrence.

(2) NRCS may pay an enhancement component of a CSP payment if a conservation stewardship plan demonstrates to the satisfaction of NRCS that the plan's activities will increase conservation performance including activities related to energy management as a result of additional effort by the participant and result in:

(i) The improvement of a resource concern by implementing or maintaining multiple conservation practices or measures that exceed the minimum eligibility requirements for the contract's Tier of participation as outlined in the sign-up notice and as described in § 1469.5(e) and the contract requirements in § 1469.21; or

(ii) An improvement in a local resource concern based on local priorities and in addition to the national significant resource concerns, as determined by NRCS.

(3) NRCS may also pay an enhancement component of a CSP payment if a participant:

(i) Participates in an on-farm conservation research, demonstration, or pilot project as outlined in the sign-up notice; or

(ii) Cooperates with other producers to implement watershed or regional resource conservation plans that involve at least 75 percent of the producers in the targeted area; or

(iii) Carries out assessment and evaluation activities relating to practices included in the conservation stewardship plan as outlined in the sign-up notice.

(4) NRCS will not pay the enhancement component of a CSP payment for any practice that is required to meet the conservation compliance plan requirements found in 7 CFR Part 12.

(5) Eligible enhancement payments.

(i) State Conservationists, with advice from the State Technical Committees, will develop proposed enhancement payment amounts for each practice and activity.

(ii) An enhancement payment will be made to encourage a producer to perform or continue a management practice or activity, resource assessment and evaluation

project, or field-test a research, demonstration, or pilot project that produces enhanced environmental performance and benefits or produces information and data to improve a resource concern or update the NRCS technical guides. Enhancement payments will be:

(A) For activities where NRCS can demonstrate the economic value of the environmental benefits, based on a given activity's expected environmental benefit value. The payment may not exceed the activity's expected economic value; or

(B) For activities where NRCS cannot demonstrate the economic value of the environmental benefits, a rate that will not exceed a producer's cost to implement a given activity.

(iii) NRCS will post the list of approved enhancement activities and payment amounts for each activity concurrent with the CSP sign-up notice.

(6) The Chief may set a not-to-exceed limit or variable payment rate for the enhancement payment in any given sign-up notice.

(7) Enhancements above the minimum criteria for the resource concern that are included in the benchmark inventory may be included in the first CSP payment.

(e) Contracts will be limited as follows:

(1) $20,000 per year for a Tier I conservation stewardship contract,

(2) $35,000 per year for a Tier II conservation stewardship contract, or

(3) $45,000 per year for a Tier III conservation stewardship contract.

(4) Stewardship components of CSP payments cannot exceed $5,000 per year for Tier I, $10,500 per year for Tier II, or $13,500 per year for Tier III.

(5) The new practice payment will not exceed 50 percent of the average county costs of installing the practice (or a similar practice, if new) in the 2001 crop year with the exception of beginning and limited resource producers, in which case the new practice payment may be up to 65 percent.

(f) The new practice and enhancement components of the conservation stewardship contract payment may increase once the participant applies and agrees to maintain additional conservation practices and activities as described in the conservation stewardship plan.

(g) The Chief of NRCS may limit the stewardship, practice, and enhancement components of CSP payments in order to focus funding toward targeted activities and conservation benefits the Chief identifies in the sign-up notice and any subsequent addenda.

(h) In the event that annual funding is insufficient to fund existing contract commitments, the existing contracts will be pro-rated in that contract year.

(i) NRCS may not make any payments to participants for:

(1) Practices within their conservation stewardship plan that are required to meet conservation compliance requirements found in 7 CFR Part 12;

(2) Practices that are included in maintenance agreements (with financial reimbursements for maintenance) that existed prior to the conservation stewardship contract approval;

(3) Construction or maintenance of animal waste storage or treatment facilities or associated waste transport or transfer devices for animal feeding operations;

(4) The purchase or maintenance of equipment;

(5) A non-land based structure that is not integral to a land based practice, as determined by the Chief; or

(6) New practices that were applied with cost-share assistance through other USDA cost-share programs.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th of April 2014, I served via the Court's

electronic filing system, the foregoing **Plaintiff-Appellant's Corrected Initial**

**Brief** on the following individual:

> Sharon A. Snyder
> U.S. Department of Justice
> Commercial Litigation Branch
> P.O. Box 480
> Ben Franklin Station
> Washington, D.C. 20044
> (202) 616-0347
> (202) 514-7969 – Fax
> email: Sharon.Snyder@usdoj.gov
>
> Counsel for Defendant-Appellee

s/*Alan I. Saltman*
Alan I. Saltman

## <u>CERTIFICATE OF COMPLIANCE</u>
PURSUANT TO FED. R. APP. 32(a)(7)(C)
for Case No. 2014-5053

I certify that pursuant to Fed. R. App. P. 32(a)(7) (C), the attached principal

brief of Appellant-Petitioner is proportionately spaced, has a typeface of 14 points

or more and contains 4,653 words.

By:     *Alan I. Saltman*

Alan I. Saltman
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Avenue, N.W.
Suite 600
Washington, D.C. 20036
(202) 452-2140
(202) 775-8217 – Fax
email: AISaltman@smithcurrie.com

Counsel for Plaintiff-Appellant

Dated:   April 28, 2014